## IN THE MATTER OF THE REMOVAL OF GEORGE DURFEE AS ASSIGNEE.

The court can remove under the "act in relation to the supreme court," a voluntary assignee for the benefit of creditors, upon *petition*, for cause shown, only in case the application for his removal be made by a majority in interest of the creditors *interested in the assignment*; the remedy, in case such majority do not apply, being by *bill* only.

In ascertaining such majority, lien creditors and mortgagees who are fully secured outside the assignment are not to be reckoned as "interested," in the sense of the statute, in it.

A court of equity will not remove a trustee on the ground of an honest mistake or misjudgment in the execution of his trust, nor, under circumstances, even hold him accountable for the consequences of his mistake or misjudgment.

But where a trustee under a voluntary assignment for creditors, is proved to have advised fictitious preferences to be inserted in the same for the purpose of defeating the claim of a particular creditor, the court, for that cause, will remove him from the trust upon the application of a majority in interest of the other creditors, although he has, in disregard of the preferences of the assignment, settled, out of the assigned property, the claim of the creditor who was the object of the fraudulent assignment.

PETITION of Catharine Campbell and others, representing themselves as a majority in interest of the creditors of Thomas C. Campbell, interested in his voluntary deed of assignment for the benefit of his creditors, executed on the 26th day of July, 1856, to George Durfee, of Providence. The petition was filed under the fifth section of the "act in relation to the supreme court," (Rev. 44, 90, 91,) as amended by an act in addition to said act, passed at the January session, 1856, (Schedule of January session of general assembly, 1856, page 7,) and prayed, that Durfee might be required, on oath, to render to the court an inventory of all the effects, estate, and credits of the assigned estate, and be removed from his trust as assignee of said Campbell, and that some other suitable person might be appointed trustee in his stead, or, that said Durfee be ordered to give bond for the faithful performance of the trusts of said assignment. The cause originally assigned in the petition, was, that Durfee had postponed in payment the claims and debts of the petitioners, to the payment of a debt due to John D. Burgess, although the former were preferred in payment by the terms of the deed of assignment, and so had been guilty of a breach of trust. Another cause was afterwards added by way

34 *

In the Matter of Durfee.

of amendment to the petition, upon leave granted, which was, " that said assignment made by said Campbell, to said Durfee, was fraudulently made and executed by said Campbell, and was fraudulently accepted by said Durfee, with the intent to hinder, delay, and defraud the creditors of said Campbell in the prosecution of their claims against him."

The deed of assignment, which embraced by its terms all the estate of Campbell of every kind and nature, amongst which was real estate of considerable value, after providing for the sale of the assigned property, and the collection of the debts due to the assignor, directed the assignee to pay, out of the proceeds of sales and collections, the claims and debts, in the following order of precedence:

*First,* the expenses of making and executing the deed of trust, and of executing the trusts created by it, and to retain out of the proceeds of sales and collections, a reasonable compensation for his services as assignee.

*Second,* that the assignee should indemnify himself out of said proceeds, " *as indorser or guarantor upon a certain promissory note, signed by me the said Thomas C. Campbell,* and payable to Barney Campbell or order, *for the sum of five hundred dollars.*"

*Third,* pay all the debts, notes, or bonds due to *Barney Campbell* from the assignor.

*Fourth,* pay to Timothy Hughes $750, borrowed money.

*Fifth,* pay to Richard Saunders $511, borrowed money.

*Sixth,* pay to Daniel Campbell $363, borrowed money.

*Seventh,* pay to Catharine Campbell $240, borrowed money.

*Eighth,* pay to John McCarten $710, borrowed money.

*Ninth,* pay to Thomas McDonald $300, borrowed money.

*Tenth,* pay to Ann Hughes $204, borrowed money, and,

*Eleventh,* to distribute the residue of said proceeds ratably amongst the other creditors of the assignor, in proportion to their respective demands, *provided,* that no creditor should receive a dividend under the residuary clause, unless he should execute to the assignee, within four months from the date of the deed of assignment, a release under seal, of his claim and demand against the assignor, and that all dividends struck in favor of

non-releasing creditors, should be paid over to the assignor, or to such person as he might appoint.

There was much discussion at the hearing, whether the petitioners were " a majority in interest of the creditors *interested in the deed of assignment*," according to the requisition of the act in addition and amendment, passed at the January session of the general assembly, 1856; it appearing, that there were large creditors of the assignor, not parties to the petition, whose debts were fully secured on the real estate of the assignor, by mortgages and liens, prior in date and operation to the deed of assignment.

Campbell, the assignor, testified also to the circumstances under which the deed of assignment was executed. The substance of his testimony was, that he was desirous of preventing John D. Burgess, who pretended, as he believed, unjustly, a large ·claim against him, from obtaining payment out of his estate; that he communicated his condition to George Durfee, and under his advice, urged upon him, executed the deed of assignment in question to Durfee, with fictitious preferences in favor of his friends, so that he might eventually get his property, or his real estate, back again, after payment of the mortgages and liens upon it; that Durfee did not name to him the persons to be preferred, but repeatedly urged upon him to select trusty persons out of his own acquaintances and friends, in favor of whom, preferences, for fictitious debts in whole or part, should be inserted in his assignment. He further swore, that the first preference in the assignment, indemnifying the assignee, Durfee himself, as indorser or guarantor of a note for $500, in favor of Barney Campbell, was a fraudulent preference, no such note having ever been held by Barney Campbell; that the debt to Timothy Hughes, stated in the assignment to be $750, was in truth but $250; that the debt to Richard Saunders, stated in the assignment to be $511, was in truth but $250; that the debt to Catharine Campbell, stated in the assignment to be $240, was in truth but $130; that the debt to Daniel Campbell, stated in the assignment to be $363, was in truth but $200; that he owed Thomas McDonald $40, instead of $300; Ann Hughes $60, instead of $204; and John McCarten nothing, instead of

$710, as stated in the assignment. This witness was confirmed by the testimony of *Barney Campbell,* who swore, in substance, that the assignor did not owe him a dollar, or more than a dollar, although he received from him, on the night of the assignment, at his house, a note for $500, on demand, dated April 3d, 1856, whilst Durfee was in the bar-room below, though not in the presence of Durfee, *without consideration, upon which, however, Durfee was neither indorser nor guarantor.* He was also confirmed by the testimony of John McCarten, who swore that Campbell, the assignor, never owed him more than twenty-five cents, though he gave him a note for about the amount named in the assignment, a few days after its execution, without consideration, which he told him was preferred, telling him also the course which he intended to pursue. He was contradicted by the testimony of *Catharine Campbell,* whose name headed the petition, from which she withdrew her name by leave, and swore, that the assignor owed her $250, as stated in the assignment, instead of $130, as he swore; and that she had signed the petition in ignorance of what it contained.

It appeared also that Durfee, the assignee, upon obtaining the consent thereto of only a portion of those, really creditors of the assignor and preferred in the assignment, had, out of the assigned property, paid Burgess, the person intended to be defrauded by the assignment, a portion of his claim, in discharge of the assigned fund, though not in discharge of the assignor, except as to claims *liquidated and paid* by Burgess for him. Some discussion arose at the bar, whether Burgess was, under such circumstances, a creditor interested in the assignment, and whose balance, therefore, was to be reckoned, since he was not a party to the petition, in ascertaining whether the petitioners were a *majority in interest* of the *bonâ fide* creditors of the assignor.

The cause was conducted by *Parkhurst,* on the part of the petitioning creditors, and by *Metcalf,* on the part of Durfee, the assignee, and was shortly spoken to by both, after the proof was closed. The proof came in on several days, the hearing being continued from time to time, on account of amendments to the petition, and of leave granted to creditors, to withdraw from, or

In the Matter of Durfee.

become parties to the petition,—or to the petitioners, to strike out from their number, the names of those, whose claims were ascertained by the proof to be fictitious.

*Metcalf* made the following points :

*First*, That the court could not grant the petition, or act upon it, otherwise than to dismiss it, because, reckoning the mortgage and lien creditors, the petition did not represent a majority in interest of the creditors of the assignor, interested in the assignment.

*Second*, That the payment made to Burgess, at the request of some, though not of all of the creditors whose claims were preferred to his in the assignment, was no cause for the assignee's removal, because it was an honest appropriation of the assigned funds to the debt of a creditor intended to be defrauded by the assignment, and was made for the protection of the trust against his apprehended action.

*Third*, That there is no such satisfactory proof that Durfee, the assignee, participated in the fraud, evidently designed to be worked by this assignment, as would justify the court in removing the assignee; that proof resting entirely upon the testimony of Campbell, the fraudulent assignor, who confesses himself to have entered into the fraudulent scheme, and who had thus stripped himself of credit, as a witness. On the contrary, that the fact that the assignee, upon discovering the injury intended to Burgess, settled with him, as well as the testimony of Catharine Campbell, explicitly contradicting the testimony of the assignor, so far as her claim is concerned, pointed strongly in the opposite direction, both to discredit the assignor, and accredit the honesty and good faith of the assignee.

*Fourth*, Admitting that the fraud of the assignment was originally advised by the assignor, that there was no proof, but the contrary, that he had acted fraudulently under the assignment, or attempted to carry out the fraudulent scheme; and.that the only cause of the removal of an assignee, contemplated by the additional act of January, 1856, was a breach of duty in the *execution* of his trust, as distinguished from a criminal participation in the creation of a fraudulent trust deed, under which he *honestly* acted.

*Parkhurst*, who had originally submitted the petition upon the proofs, as amply sufficient to support the prayer of it, took the following points, in reply:

*First*, That mortgage and lien creditors, proved, as in this case, to be amply secured upon the assigned property, with precedence over the assignment, are not, in the sense of the act, "interested in the assignment;" and so ought not to be reckoned, in ascertaining whether the petitioners are " a majority in interest" of such creditors.

*Second*, That the assignee, in paying the claim of Burgess in preference to the honest claims of those preferred in the assignment, violated the only trust with which he was clothed; the license or request of the preferred creditors, under which he justified such prior payment out of the assigned property, being signed by only three of the *actual* creditors of the assignor preferred in the assignment, the other two signers, McCarten and Barney Campbell, being proved, by both Thomas Campbell and by their own oaths, to have had no real claim against the assigned estate whatsoever.

*Third*, The assignor Campbell, is supported in his testimony inculpating Durfee as a participator in the fraudulent design of the assignment, by the fact, that the first preference of the assignment is an indemnity to Durfee, as the indorser or guarantor of a note due from Campbell, the assignor, to Barney Campbell for $500; and it is proved by Barney Campbell, as well as himself, that such an indorsed or guarantied note never had an existence.

AMES, C. J. We should much prefer to act upon an assignment confessedly made for the purpose that this was, and containing preferences of fictitious and fraudulently overstated debts, inserted to carry out that purpose, by wholly setting it aside, on the ground of *actual* fraud, upon the direct application to that effect of those, or some of those, interested. Such is not, however, the application made to us; and upon this petition we must give such relief as is asked, provided the petitioning creditors are, under the law, entitled to it.

The statute gives us power, upon *petition*, to remove an assignee under a voluntary assignment, only " upon the application

of a majority in interest of the creditors interested in any deed of assignment made by a debtor for the benefit of his creditors," and " for cause shown."    Act of Jan. sess. 1856, sched., 71, § 1. Upon the application of any less number of the creditors in interest, we must proceed in such a matter, if at all, *upon a bill filed* on the equity side of the court, under the ordinary jurisdiction over trusts and trustees, exercised by a court of chancery. In *this* proceeding, then, the first question for us tó decide, is, whether this application is made by "a majority in interest of the creditors" of Thomas C. Campbell, " *interested in his assignment;*" for if not, whatever may be the cause shown for the removal of the assignee, we cannot act upon this application. Considering the proof before us, this question depends for its solution upon our decision of another; and that is, whether, in the sense of this clause of the statute, mortgage or lien creditors of the assignor, whose claims have precedence of the assignment, and are proved to be amply secured upon the assigned property, are creditors " *interested in the deed of assignment.*"    We are all satisfied that they are not, whether we look at the words, or the spirit and purpose, of the act in question. The statute does not stop with saying " a majority in interest of the creditors" of the assignor ; but specifies also the majority in interest of what creditors was intended by it, by the words, "interested in the assignment."    Recollecting that, in one sense, *all* the creditors of an assignor are interested in his assignment for the benefit of his creditors, and that we are bound to give full effect to *all* the words of the act, if we consistently can, it is evident, that the statute, by these qualifying words, did not intend such general or contingent interest, but meant to distinguish between the creditors of the assignor, in this matter ; classing some of them as interested, and some as *not* interested, in the deed of assignment.    *All* the creditors might be, and usually are, in some mode, embraced within the scope of such an instrument ; but the statute recognizes the fact that some of them are *not*, as well as that some of them *are*, " interested " in it. Without intending, by our remarks in this direction, to go any further than is necessary for the decision of the question before us, we deem it perfectly clear, that mortgage or lien creditors,

who have ample security, prior to the assignment, on the assigned property, so as to render their interest, an interest, not under the assignment or in it, but an interest in competition with, and opposed to it, are not, in the sense of the act, "creditors interested" in the assignment; and so are not to be reckoned, in ascertaining whether a majority in interest, of *such creditors*, are applicants to the court for the statute relief. This meaning, too, is pointed at by the obvious purpose of the qualifying words, and is necessary to give the clause a *sensible* construction. Whilst, on the one hand, the statute did not intend to give this summary process for the removal of assignees, except in such cases of necessity or plain expediency as would probably enlist a majority in interest of the creditors really having something at stake upon the application, it surely did not intend to place the remedy of those who had really such a stake, at the mercy of those who were only *nominally* interested. Only those interested in the *administration* of the assigned property, should, in reason, be able to decide upon the remedy for *mal-*administration of it. From the parties before us, therefore, we have jurisdiction over the subject of this application.

Has "cause been shown," sufficient to warrant us in the removal of this assignee? Were this the case of an assignment containing preferences of fictitious and overstated debts made by the assignor, without participation in such fraud by the assignee, and for the purpose of protecting the trust from the action of those against whom the fraud was pointed, and upon ascertaining the fraud, had the assignee honestly and fairly settled the claims of the defrauded parties out of the assigned fund, as the best that could be done under the circumstances, we should have great difficulty in going to the extent of *removing him* for such conduct, even though he had not secured the consent of *all* interested in the matter under the assignment. Without such consent, it certainly would be more safe and proper for him to ask, in such a case, the advice of the court, to which, as a trustee, he is amenable, if not to have the matter adjudicated by an adversary suit; or at least, by a reference of the claim, made against the assignment. But courts of equity do not *remove* trustees for honest and fair conduct in the dili-

gent performance of the supposed duties of their trusts, even though they may have misjudged or been mistaken. For such mistake or misjudgment, a court of equity will not, under circumstances, even hold the trustee accountable, as this court had occasion to consider in *Hodges* v. *The New England Screw Co.* 1 R. I. Rep. 312, 345, 346, 350, and much less will remove him from his trust, as one who has disentitled himself to the confidence of the court.

The grave charge against this trustee is, that he advised the very fraud which this instrument was designed to carry out, and the perpetration of which he, as trustee, was to superintend, in his character of protector and executor of the fraudulent trust. The statute does not specify for what cause a trustee may be removed by this summary proceeding, but by the general words, " for cause shown," leaves that to the judicial and instructed discretion of the court. Now, without going into authorities for the purpose of ascertaining for what cause a court of equity will, and in what cases a court of equity will not, remove a trustee, we have no hesitation in saying, that if this charge be proved, a stronger reason for removal could not be shown. It would be strange, indeed, if, notwithstanding the protest of honest creditors interested in the faithful administration of the trust property, the court should insist upon hazarding their interests by keeping them in the charge of one who, by actual fraud, has gotten that charge into his hands. The character of the act, by which he obtained the possession of the trust, portends his conduct in it; so that the only thing left for a court of equity to do, if honest men ask it, is to remove him from an office which he has thus unworthily obtained. The court would be bound, for this cause, upon proper application, to set aside the *whole* trust; and surely it cannot be doubted, where that is the case, that they are bound, upon this application, to remove the fraudulent trustee, if it be proved that his advice generated the fraudulent trust. It is a small matter, in such a case, that when detected, he has done justice, it may be, to the creditor intended to be defrauded, rather than lose the emoluments of the trusteeship, first secured in the deed of trust, even if his payment of that creditor, contrary to the

directions of the deed, is to be viewed in the light of tardy and compelled *justice*.　But we should be rather disposed to view it as a part of the same scheme of fraud with which the transaction commenced; and that, having obtained the assignment, for his own selfish purposes, out of the ignorance and want of principle of the assignor, and designing to keep it for the same purposes, the assignee is ready to collude with the very person against whom the assignment was directed; and in so doing, to disregard and set at nought the bounds, set for him in the very deed of trust, by the other, and less fortunate, object of his practices.　Surely, the disregard of the deed of trust, under such circumstances, cannot recommend a trustee to the favor of a court of law or of equity; or make it deaf to the request of honest creditors that *their* interests may be rescued from his hands.

Has, then, this charge been reasonably proved, considering the nature of it?　It is not denied that this assignment contains preferences of fictitious and overstated debts, or, that the purpose of it was, as it could only be, to defraud creditors entitled to have the assignor's property devoted to the payment of their debts; and according to the testimony of Burgess, *he* was aimed at only as the guarantor for the assignor of certain contracts made by him for the assignor, in the character of an agent merely.　Indeed, this last evidence is placed before us, by the assignee himself, for the purpose of making out one branch of his defence.

Now, it is true, that the evidence of the assignee's participation in this fraudulent scheme, or rather that he was the adviser of it, comes mainly from the assignor himself, who confesses that he was an instrument and accomplice in the fraud, and thus, to some extent, discredits himself, as a witness.　Such testimony is not, however, to be *rejected* by a court; since they would be bound, under proper cautions as to the reliance to be placed upon it, to allow it to pass for consideration to a jury. Experience teaches us that the whole secret truth, with regard to such a transaction, can rarely be ascertained, except from the confessions and disclosures under oath of the parties to it themselves.　The motive to such disclosure is ordinarily the same as

to the transaction itself—self-interest; although, sometimes, and it may be so in this case, it is a mingling of the sense of having been overreached by superior cunning, with the desire to revenge it; a frequent cause of that "falling out," from which honest men, it is said, sometimes get their dues. But whatever may be the motive, so that it be not apparently such as necessarily to lead to falsehood, experience vouches that with caution, we may, and the protection of society requires that we should, rely upon such testimony to some extent. Much depends upon the manner and appearance of the witness under such circumstances, whether open, frank, and unguarded,—and whether he discloses readily and fully, without regard to consequences to himself, or, by way of excusing his own misconduct, seems to seek to inculpate others only for his own protection. In these respects, the assignor, Thomas C. Campbell, impresses us favorably, and appears to speak as a witness of truth. Still, we should be unwilling, without some extraneous support to his testimony, to act solely upon it, in a matter affecting so gravely the character of another. Without looking about for slight supports to the truth of his statement in this particular, of which there are several, we are all struck with that suggested by the counsel for the petitioners, and in which the assignor is supported by the testimony of Barney Campbell, and which indeed, except by implication, and criticizing the testimony of this witness and of the assignor, as if worded with the accuracy of a special plea, is not fairly denied by the counsel for the assignee himself. The assignment secures, as its first preference, the assignee against liability as the indorser or guarantor for the assignor, on a note for $500, payable on demand, to Barney Campbell. That such a preference was given, by the assignment, stared the assignee, of course, in the face, from the moment it was first given. Where is that note, with the assignee's guaranty or indorsement upon it, if such a guaranty or indorsement were ever given? Why has it not been taken up and produced to us, if it ever existed? for certainly, as the first preference of the assignment, self-interest, as well as duty, would have prompted the assignee to apply the assets of the trust fund to his *own* proper indemnity, whilst attending so assiduously to

the just, it may be, but wholly unpreferred claims of the creditor, Burgess!! The note is not produced, as it probably would be, if it ever had an existence; nor is there the least evidence that it ever did exist. So far from it, the witness, Barney Campbell, whom the assignment represents as the payee and holder of the note, as well as the assignor, swear—the former, that he never held such a note, but only a note of that tenor and amount given to him by the assignor, without consideration, as before stated, which he produces, and which is not indorsed or guarantied by Durfee, the assignee—the latter, that such an indorsement or guaranty was never accommodated to him by the assignor, and that the whole statement was a fiction, in order to cover up, under the indemnity, the amount of $500 from the creditor, or creditors, whom it was the concerted scheme of the assignment to defraud. This fraudulent preference of the assignment, must have been known to be such by the assignee. No circumstance is proved, rendering it probable that the assignee would give his indorsement or guaranty to Campbell, the assignor, for such an amount. No search, even, appears to have been made by him for the note, in order to apply the assigned property to the payment of it, in his own indemnity. The pretended payee and holder of the note never knew of its existence; and under such circumstances, it is too much for the counsel of the assignee to ask us to believe, as he does, contrary to the express swearing of the assignor, that such an indorsed or guarantied note was, or might have been, executed in good faith by the assignee, and handed by him to the assignor, to be applied to the security of a debt to that amount *supposed* by the former to be due by the latter to Barney Campbell, though, in truth, nothing was due to him, and such a note never came to his possession. There is no basis in the proof for such an explanation; nothing in the character or habits of dealing between the assignor or assignee which permits us to entertain it for a moment. We deem, therefore, that the testimony of Campbell, the assignor, is fully supported, in the particular, that Durfee, the assignee, well knew, when he took the assignment, that it contained a fraudulent preference, to wit, that for his own indemnity as indorser or guarantor of a fictitious note for $500;

which is enough of itself, and renders highly probable, under the circumstances, the further statement under oath of the assignor, that Durfee was the adviser and promoter of this *whole* scheme of fraud.

If, after all, as is possible, we are mistaken, or have been, as is alleged in defence, deceived into this conclusion by false testimony brought to bear down a fair and innocent man, we shall regret it, inasmuch as his unfortunate circumstances have made him the victim of that imperfect human justice, which can never *certainly* attain *the truth*, but only that approximation to it, and high probability of it, which erring judgment gains from erring instruments and means of evidence. This summary power of removing an assignee from his trust, is given to us for the protection of creditors, whose trust this is in the beneficial sense, and who ask this removal for their safety and protection. We should not act in such a matter without " cause shown;" but after all, it should be recollected, that it is to *their* interests that we must principally look, because *these* are involved in the due and faithful administration of the trust. The trustee has no such interest in it as they have; his real interest being confined to a just compensation only for his services as assignee, in which the latter are supposed precisely to counterbalance the former. Even if we had doubts, therefore, whether the trustee were a proper person to administer the trust, we should, upon *probable* cause, and upon the required application of a majority in interest of the creditors, remove him. This, at least, the evidence in this matter affords us; and, accordingly, an order may be entered, requiring the said George Durfee, the assignee, as soon as may be, to render to this court, on oath, an inventory of all the effects, estate, and credits conveyed to him by the deed of assignment executed to him by Thomas C. Campbell, and bearing date the 26th day of July, 1856, so far as the same can be ascertained; and that he be forthwith removed from his said trust as assignee nominated in said deed; and that Charles Parkhurst, Esq., being nominated thereto by a majority in interest of the creditors interested in said deed of assignment, and being approved by the court, be appointed assignee, under said

35 *

deed, in his place, with the rights and estates, duties, liabilities, and responsibilities appertaining thereto by virtue of said deed, and by law.