# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| WACK JILLS, Inc., f/k/a JACK WILLS, INC., | ) | |
| | ) | |
| | ) | |
| Assignor, | ) | |
| | ) | |
| To: | ) | C.A. No. 2019-0650-PAF |
| | ) | |
| SM FINANCIAL SERVICES CORPORATION, | ) | |
| | ) | |
| | ) | |
| Assignee. | ) | |

## OPINION

Date Submitted: March 29, 2024
Date Decided: August 29, 2024

Adam Hiller, HILLER LAW, LLC, Wilmington, Delaware; *Attorney for Assignee SM Financial Services Corporation.*

Daniel K. Astin, Ryan M. Ernst, CIARDI CIARDI & ASTIN, Wilmington, Delaware; Albert A. Ciardi III, Walter W. Gouldsbury III, CIARDI CIARDI & ASTIN, Philadelphia, Pennsylvania; *Attorneys for Creditor Home Club Realty Trust, Agent for Hall Associates.*

Frederick B. Rosner, THE ROSNER LAW GROUP LLC, Wilmington, Delaware; Marc J. Kurzman, CARMODY TORRANCE SANDAK & HENNESSEY LLP, Stamford, Connecticut, *Attorneys for Creditor 252-264 Greenwich Avenue Retail, LLC.*

**FIORAVANTI, Vice Chancellor**

In this assignment for the benefit of creditors or "ABC" proceeding, Wack Jills USA, Inc., formerly known as Jack Wills, Inc. ("Wack Jills" or the "Assignor"), assigned all its property and assets to SM Financial Services Corporation ("SM Financial" or the "Assignee") in August 2019.

SM Financial, in its capacity as trustee of the JW ABC Trust (the "Trust"), seeks approval of a Motion to Approve Final Distributions and Close the Case (the "Motion"). Home Club Realty Trust, Agent for Hall Associates ("Home Club" or the "Objector"), a general unsecured creditor of the Assignor, objects to the approval of the Motion.

In Delaware, ABC proceedings are governed by statute. *See* 10 *Del. C.* §§ 7381–87 (the "ABC Statute"). The ABC Statute has seven sections, which set forth several requirements. Specifically, assignees must file an affidavit of inventory within 30 days of the assignment, give bond as approved by the court, and submit annual accountings. These requirements are clear, and they are mandatory.

The Assignee in this case did not come close to satisfying the requirements of the ABC Statute—and conceded as much. In addition, the Assignee's compensation structure provided no incentive to minimize Trust expenses because the Assignee received a 20% commission on all amounts distributed to creditors *and* all amounts paid in costs and expenses. To that end, the Assignee's authorized representative retained his New Jersey law firm as counsel to the Assignee after having already

retained Delaware counsel. Further, the Assignee never communicated with the Assignor or any of its directors or officers and did not request its financial records. And it was not until over a year into the process that the Assignee learned that the Assignor's estate included a leasehold in Connecticut.

The court concludes that the Assignee's failure to comply with the requirements of the ABC Statute and to act in the best interest of the Assignor's creditors constitutes sufficient cause to remove the Assignee pursuant to 10 *Del. C.* § 7386. Accordingly, the Motion is denied, and SM Financial is removed as Assignee.

## I. BACKGROUND[1]

### A. Events Leading to the Assignment

The Assignor,[2] a Delaware corporation, was the U.S. affiliate of an international clothing retailer and sold children's clothing and accessories in three

---

[1] Citations to the docket in this action are in the form of "Dkt. [#]." In citations, the Petition for Assignment for the Benefit of Creditors in this action, Dkt. 1, will be cited as "ABC Petition," and citations to the transcript of the evidentiary hearing, Dkt. 92, will be cited as "Evidentiary Hearing." After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended.

[2] During these proceedings, the Assignee, with the court's approval, filed an amendment to the Assignor's certificate of incorporation changing its name from "Jack Wills, Inc." to "Wack Jills, USA, Inc." Dkts. 8, 19. The Assignee subsequently moved, however, to amend the case caption to "Wack Jills, Inc.," and the parties have employed that caption throughout these proceedings. *See* Dkt. 20.

2

stores in Massachusetts.[3] Prior to the filing of this proceeding, the Assignor's parent company, Jack Wills Retail, Ltd., was placed into an insolvency proceeding in the United Kingdom.[4] In that proceeding, the assets of many of the Assignor's affiliates were sold to a third party, Sports Direct.com Retail Limited ("Sports Direct").[5] The Assignor's assets were not sold in the insolvency proceeding.[6]

Prior to the assignment, the Delaware law firm of Hiller Law, LLC ("Hiller Law") contacted Steven Mitnick, Esquire, a New Jersey attorney and SM Financial's general counsel, about serving as the assignee for Wack Jills in a Delaware ABC proceeding.[7] SM Financial is a New Jersey corporation that provides liquidation services in court-supervised proceedings such as ABCs.[8] Mitnick estimated that he or SM Financial have served as an assignee in more than 500 ABC cases in New Jersey in the past 43 years and fewer than five ABC proceedings in Delaware.[9] SM Financial is a family business, owned entirely by Mitnick's wife and two adult

---

[3] ABC Petition ¶¶ 2–3.

[4] *Id.* ¶ 3; Dkt. 8 ¶ 5.

[5] ABC Petition ¶ 3; Dkt. 8 ¶ 5; Evidentiary Hearing at 16:20–22 (Mitnick) (explaining that Sports Direct purchased the Assignor's parent company's assets in the UK insolvency proceeding).

[6] ABC Petition ¶ 3.

[7] Evidentiary Hearing at 57:5–13, 58:8–11 (Mitnick).

[8] ABC Petition ¶ 5; Evidentiary Hearing at 56:20–21 (Mitnick).

[9] Evidentiary Hearing at 12:22–13:18 (Mitnick).

children.[10]  Mitnick owns and operates SM Law, PC ("SM Law"), a New Jersey law firm.[11]

## B.    The Assignment Agreement

On August 15, 2019, the Assignor and SM Financial entered into the Trust Agreement and Assignment for the Benefit of Creditors (the "Assignment Agreement") and created the Trust.[12]  Mitnick executed the Assignment Agreement on behalf of SM Financial and has served as its authorized representative in these proceedings.[13]  Pursuant to the Assignment Agreement, the Assignor assigned all of its property and assets to SM Financial as the Assignee for distribution to the Assignor's creditors (the "Assignment").[14]  The Assignee is the trustee of the Trust.[15]  The beneficiaries of the Trust are the Assignor's creditors as of the Assignment.[16]

---

[10] *Id.* at 56:18–57:4 (Mitnick) ("Q:  Who are the principals of SM Financial Services?  A: SM Financial Services is a New Jersey corporation, 60 percent owned by Jane Mitnick, who is my wife, and 20 percent owned by each of -- trusts for my two daughters, who are now grown. . . .  It is a family-owned business.").

[11] *Id.* at 14:1–5 (Mitnick).

[12] ABC Petition Ex. A [hereinafter "Assignment Agreement"].

[13] *Id.* at 14; Evidentiary Hearing at 14:7–15 (Mitnick).

[14] Assignment Agreement §§ 1.2–1.3.

[15] *Id.* § 1.5.

[16] *Id.* § 1.6.

4

Section 2 of the Assignment Agreement outlines the rights, powers, and duties of the Assignee in administering the Trust. Under the Assignment Agreement, the Assignee "shall have full right, power, and discretion to manage the affairs of the Trust."[17] Specifically, the Assignee is empowered to, among other things, maintain bank accounts,[18] cause the Trust to perform or continue performance under any contracts or leases that are Trust assets,[19] retain professionals, employees, and consultants on behalf of the Trust,[20] collect, liquidate, and administer the Trust's assets,[21] maintain the Trust's books and records,[22] and pay administrative expenses of the Trust.[23] Per the Assignment Agreement, the Assignee was permitted "to retain Hiller Law [] as counsel and others as necessary and appropriate, in the Assignee's sole discretion."[24] In addition to Hiller Law, the Assignee retained SM Law to provide legal services to the Trust.[25]

---

[17] *Id.* § 2.1.

[18] *Id.* § 2.1(b).

[19] *Id.* § 2.1(c).

[20] *Id.* § 2.1(e).

[21] *Id.* § 2.1(k).

[22] *Id.* § 2.1(n).

[23] *Id.* §§ 2.1(o)–(q).

[24] *Id.* § 2.1(e).

[25] Dkt. 23 Ex. A; Evidentiary Hearing at 59:16–20 (Mitnick).

Section 2.7 of the Assignment Agreement provides that the Assignee's compensation "shall be 20% of the amount of distributions made from the Trust in accordance with [Section] 2.3 [of the Assignment Agreement] (including but not limited to distributions of cash made to secured creditors on account of their collateral)."[26] Under Section 2.3, distributions include, but are not limited to, administrative expenses of the Trust such as attorneys' fees and payments to the Assignor's creditors to satisfy claims against the Assignment estate.[27] The Assignee is required to make distributions in the following sequence:

> (A) First, expenses and debts of the Trust shall be paid or reserved for, including but not limited to amounts owed to the Assignee, the Trust's professionals, and the Assignor's professionals (pursuant to [Sections] 1.6.4 and 2.2 hereof); (B) Second, to the General Trust Beneficiaries, *pro rata*, until their enforceable claims (including but not limited to any and all enforceable interest, charges, and fees) against the Assignor are satisfied in full; then (C) Finally, to the holders of equity in the Assignor, *pro rata*.[28]

---

[26] Assignment Agreement § 2.7(a).

[27] *See id.* § 2.3.

[28] *Id.* Section 2.2 of the Assignment Agreement states that the Trust assets "shall be used to pay amounts due to the Assignee pursuant to [Section] 2.7 hereof and the fees and expenses of any attorney, consultant, or other professional, vendor, or agent retained by the Assignee[.]" Attorney fees and expenses "shall be paid from the Trust Assets as administrative expenses as they arise in the ordinary course of business." *Id.* § 2.2. Section 1.6.4 of the Assignment Agreement provides that professionals asserting claims for fees and expense reimbursements are not beneficiaries of the Trust, and the Assignee "assumes all such claims and shall cause them to be paid from funds of the Trust as administrative expenses in the ordinary course of business."

In addition, the Assignee may be reimbursed from the Trust's assets for all "reasonable documented actual out-of-pocket expenses incurred in the performance of its duties."[29]

Based on this compensation structure, SM Financial was entitled to receive 20% of all funds distributed to the Assignor's creditors and an amount equal to 20% of all costs and expenses incurred during the Assignment process, including amounts paid to SM Law. In sum, the Assignee's compensation was 20% of all funds it received at the time of the Assignment and all amounts collected thereafter— regardless of how those funds were ultimately used. As structured, the Assignee had no incentive to minimize costs and expenses. Indeed, by hiring SM Law as a second law firm to the Assignee, the Mitnick family was in a position to increase its share of the proceeds from the Assignment estate by billing for SM Law's legal services and then receiving a 20% commission on top of those expenses.

Section 5 of the Assignment Agreement provides that the Trust will terminate upon the earlier of (i) the distribution of all the Trust's assets; (ii) a court order terminating the Trust; or (iii) five years after the effective date of the Assignment

---

[29] *Id.* § 2.7(a).

Agreement.[30]  If warranted, the term of the Trust may be extended for a finite term, subject to approval by the court.[31]  The court may also retroactively extend the term of the Trust if it terminates prior to all the Trust's assets being administered.[32]

The Assignee may resign at any time upon at least 30 days' written notice by filing a notice of resignation with this court.[33]  The Assignor may remove the Assignee at any time with or without cause by written agreement.[34]  The Assignment Agreement also specifically provides that the court may remove the Assignee for cause.[35]  The Assignment Agreement purports to exculpate the Assignee from

---

[30] *Id.* § 5.  The Assignment Agreement is dated August 15, 2019.  *Id.* at 1. The Assignee and Assignor executed the Assignment Agreement on August 15, 2019, and August 16, 2019, respectively.  *Id.* at 14.

[31] *Id.* § 5.

[32] *Id.*

[33] *Id.* § 4.1.

[34] *Id.* § 4.2.  In this court's experience, the prospect of an assignor terminating an assignee is remote.  Typically, once an assignee is hired, directors and officers of the assignor scatter and are not involved in the ABC process.  Perhaps one representative stays behind to provide information to the assignee, but that is not always the case.  Indeed, in this case, the Assignee represented that the Assignor's directors and officers had either resigned or were in the process of resigning from their positions as of October 2, 2019, "leaving the [Assignor] without governance" less than two months after the Assignment occurred.  Dkt. 8 ¶ 6.

[35] Assignment Agreement § 4.3.  The Assignment Agreement defines "cause" as "the willful and continued refusal by the Assignee to perform the duties set forth herein," "gross negligence, gross misconduct, fraud, embezzlement, or theft, regardless of whether such acts were directed at assets of the Trust," or "such other cause as the Court shall determine to evidence that the Assignee is unable or unfit to perform the duties set forth herein."  *Id.*

liability for good faith business decisions except in the case of fraud, willful misconduct, recklessness, or gross negligence.[36]

## C.    Sports Direct Sale

At or around the time the Assignee and Assignor executed the Assignment Agreement, Mitnick contacted Auction Advisors to assist with the Assignment.[37] Auction Advisors is headquartered in New York and "is primarily in the business of liquidating and auctioning hard assets and real estate[.]"[38] It also provides appraisal and receivership services.[39] Auction Advisors has previously worked with Mitnick on various liquidation proceedings.[40] Auction Advisors dispatched a representative to Massachusetts to attempt to inspect the three stores that contained the Assignor's inventory.[41]

---

[36] *Id.* §§ 2.5(a), (d).   Under Section 2.5(g), the Assignee is permitted to enter into transactions "*with the Assignor and/or its principals*" if the Assignee reasonably believes such transactions are appropriate in its business judgment. *Id.* § 2.5(g) (emphasis added).

[37] Evidentiary Hearing at 47:10–14 (Mitnick) ("I'm sure the moment I hung up with Mr. Hiller, my next call was to Mr. Olshin or to his partner, Mr. Klein, to advise them that I had a new ABC that I wanted [Auction Advisors] to get involved in.").

[38] *Id.* at 64:17–19 (Olshin).

[39] *Id*. at 64:19–21 (Olshin).

[40] *Id.* at 17:22–23 (Mitnick).

[41] *Id.* at 66:7–13, 68:21–69:14 (Olshin).

Around the time of the Assignment, negotiations began with Sports Direct to purchase the apparel inventory at the Assignor's three Massachusetts stores.[42] It is not clear from the record whether these discussions commenced prior to the date of the Assignment.[43]

Attempts to assess the assets of the Assignor and to negotiate with Sports Direct appear to have occurred simultaneously and very quickly. On September 3, 2019, just a few weeks after the date of the Assignment, Sports Direct and the Assignee executed a purchase agreement providing for the sale of the Assignor's inventory at the three Massachusetts stores for $20,000.[44] The purchase agreement states that the Assignee "has not performed an audit of the Inventory [and] that the Purchaser is purchasing whatever Inventory exists in these locations sight

---

[42] *See id.* at 18:6–19:23, 23:4–11 (Mitnick) (discussing the negotiations with Sports Direct to purchase the apparel inventory at the Assignor's stores in Massachusetts).

[43] *See id.* at 46:22–47:1 (Mitnick) ("Q: When did the negotiations with Sports Direct start? A: You know, I don't actually recall when they began. It was probably pretty quickly after we got the deed.").

[44] Dkt. 48 Ex. C. The purchase agreement is drafted on Hiller Law letterhead and is dated August 13, 2019, two days before the date of the Assignment Agreement and three days before the filing of the ABC petition. *Id.* at 1. Representatives of the Assignee and Sports Direct executed the purchase agreement on September 3, 2019. *Id.* at 2. The August 13 date on the purchase agreement is an obvious typographical error because the purchase agreement includes the caption of this ABC proceeding, along with the civil action number. Civil action numbers are not assigned until a case has been filed and accepted on the court's docket. Thus, the reference to the civil action number in the purchase agreement indicates that the final version of the purchase agreement could not have preceded this action. Of course, that does not mean that an earlier draft of the purchase agreement pre-dated the filing of the ABC petition.

unseen[.]"[45]   In connection with the asset sale, Sports Direct agreed to make severance payments to three of the Assignor's former employees, who were U.K. nationals residing in the United States and managing the Assignor's stores.[46]   None of the details concerning the Sports Direct sale were revealed to the court until more than two years after the commencement of this proceeding.[47]

## D.     The Greenwich Lease

In addition to the three Massachusetts stores, the Assignor had been leasing commercial retail space from 252-264 Greenwich Avenue Retail, LLC (the

---

[45] *Id.* at 1 n.1.

[46] *Id.* at 1–2.  The purchase agreement identifies these three individuals as William Allen, Steve Robinson, and Mercedes Shaw, but does not describe their affiliation to the Assignor. *Id.*  At the evidentiary hearing, Mitnick testified that these individuals were managers of the Assignor's stores in Massachusetts.  Evidentiary Hearing at 24:7–17 (Mitnick) ("Q: Did Sports Direct impose any conditions on the sale?  A:  Yes, [the Assignor] had either two or three employees that I think had managed the stores who were from England who were just left high and dry when the stores closed.  I think there's very severe labor laws in the U.K., and they were afraid that they would be penalized, so they wanted to make sure that they dealt with these three employees.  So I think they were given $2,000 each as, like, a severance payment.  And that was paid in addition to the $20,000.").

[47] Information regarding the Sports Direct sale was first revealed to the court in November 2021 when Home Club filed its objection to the Motion.  Dkt. 48.  Home Club submitted a copy of the purchase agreement into the record as part of its filing. *Id.* Ex. C.  The record did not contain any specific information regarding the Sports Direct sale prior to November 2021.   There is a vague reference to an inventory sale in the Assignee's *Motion for Authority to Record Name Change for Assignor*, filed in October 2019, but no specific information about the Sports Direct sale was included in that filing.  Dkt. 8 ¶ 4 (representing that the "Assignee has sold its remaining inventory during this case and is in the process of identifying a few additional assets that may have value to the Trust"); Dkt. 14 ¶ 4 (making a similar representation regarding an inventory sale); Dkt. 23 ¶ 4 (same).

11

"Greenwich Landlord") in Greenwich, Connecticut since September 2011 (the "Greenwich Lease").[48] The Assignor and the Greenwich Landlord became parties to the lease agreement through a series of assignments dating back to September 2011.[49] In December 2014, the Assignor subleased the entirety of the premises to an unrelated third-party, Eileen Fisher, Inc. ("Fisher").[50] After subleasing the premises to Fisher, the Assignor ceased business operations at the Greenwich location.[51]

Pursuant to the terms of the sublease and in the ordinary course of business, Fisher would wire the sublease rent payments to the Assignor, which would make up the shortfall in the rent and remit the full amount to the Greenwich Landlord.[52]

---

[48] *See* Dkt. 48 Ex. A.

[49] The original lease agreement was from September 2008, and was between Cole Haan Company Store ("Cole Haan") and Brooks Properties Greenwich LLC ("Brooks Properties"). *Id.* at 6. On September 13, 2011, the Assignor entered into an Assignment and Assumption of Lease with Cole Haan, pursuant to which Cole Haan assigned its rights, interest, and obligations under the lease to the Assignor, and the Assignor became the tenant under the lease. *Id.* at 50–56. Brooks Properties, the original landlord, assigned its rights, interest, and obligations under the lease to the Greenwich Landlord on March 11, 2014. *Id.* at 57–61. The Greenwich Landlord has been the landlord of the Greenwich property since the March 2014 assignment.

[50] *Id.* at 62–71; Dkt. 40 ¶ 6 [hereinafter "Supplement to Motion"].

[51] Dkt. 58 at 3.

[52] Dkt. 40 ¶ 7; Dkt. 58 at 3. According to the Greenwich Landlord, the full monthly rent due under the primary lease was $45,505.57, and the full monthly rent due under the sublease was $31,353.22, as of the final year of the term of the primary lease. Dkt. 58 at 3. The Greenwich Landlord received rent due under the primary lease through August 2019, but then the payments ceased. *Id.*

In September and October 2019, shortly after the Assignment, Fisher wired two sublease rent payments, totaling $62,706.44 (the "Sublease Payments"), into one of the Assignor's bank accounts at HSBC Bank USA, N.A.[53] Beginning in November 2019, Fisher paid rent directly to the Greenwich Landlord and continued to do so for the remainder of the term of the sublease.[54]

The Assignee was not informed of and did not make inquiry into the Greenwich Lease at the time of the Assignment. It appears from the record that the Assignee did not formally become aware of the Greenwich Lease until December 2019, when the Greenwich Landlord submitted a proof of claim in this proceeding to the Assignee.[55] The Assignee became aware of the Sublease Payments in the HSBC account around September 2020.[56] The court was not provided with any specific information about the Greenwich Lease or the Sublease Payments until

---

[53] *Id.* at 4.

[54] *Id.* The term of the sublease expired on the date when the term of the primary lease expired. Dkt. 48 Ex. A. at 62. The term of the primary lease expired on January 31, 2020. *Id.* at 48; Dkt. 58 at 3.

[55] Supplement to Motion ¶¶ 5–6 (explaining that the Assignee was not aware of the Greenwich Lease prior to accepting the assignment); Evidentiary Hearing at 43:10–12 (Mitnick) ("We didn't even know about the Greenwich location because it wasn't a Jack Wills location when we took over."); Dkt. 48 Ex. A (Proof of claim dated December 20, 2019, submitted by the Greenwich Landlord to the Assignee).

[56] Dkt. 33 ¶ 7.

September 2021, when the Assignee filed a supplemental submission in support of the Motion.[57]

The Assignee is now in possession of the Sublease Payments.[58] As discussed below, the Sublease Payments are the subject of Home Club's objection to the Motion. This opinion does not resolve that objection.

### E. Procedural History

#### 1. The ABC Petition and Inventory Opinion

On August 16, 2019, the Assignee filed the ABC petition.[59] On September 12, 2019, the Assignee filed a motion to establish a claims bar date and claims filing procedures,[60] which the court granted on October 3, 2019.[61] That same day, the Assignee filed an "Inventory and Valuation Opinion" (the "Inventory Opinion").[62]

---

[57] Supplement to Motion ¶¶ 5–9.

[58] *Id.* ¶ 9.

[59] Dkt. 1.

[60] Dkt. 4. Unlike the federal bankruptcy code, the ABC Statute does not provide a process for submitting proof of claims. *Cf.* 11 U.S.C. § 501. However, certain assignees adopt the functional equivalent of a bankruptcy proof of claims process in Delaware ABC proceedings. *See, e.g., In re Cureatr, Inc.*, C.A. No. 2023-1274-PAF (Del. Ch.), Dkt. 6; *In re Allbright Gp. US, LLC*, C.A. No. 2021-0814-PAF (Del. Ch.), Dkt. 2.

[61] Dkt. 11.

[62] Dkt. 12 [hereinafter "Inventory Opinion"].

The Inventory Opinion is a two-page document dated September 12, 2019.[63] It was prepared by Joshua Olshin, a managing partner of Auction Advisors.[64]

The Inventory Opinion categorizes the Assignor's assets into four groups: "(i) Inventory; (ii) General Furniture, Fixtures and Equipment; (iii) Vehicles; and (iv) Liquid Assets."[65] The Inventory Opinion provides an estimated liquidation value for each asset category, which Auction Advisors calculated as of the date of the ABC Petition.[66] Auction Advisors estimated that the liquidation value of the inventory was $19,254,[67] which is slightly less than the $20,000 that Sports Direct paid for that inventory one week earlier.[68]

Auction Advisors estimated that the liquidation value of the fixtures and vehicles was $750 and $12,500, respectively.[69] For the liquid assets, Auction

---

[63] *Id.* at 1.

[64] *Id.* at 2; Evidentiary Hearing at 65:10–12 (Olshin).

[65] Inventory Opinion at 1.

[66] *Id.* The Inventory Opinion contains the following disclaimer: "We are experienced liquidators, but are not rending [sic] this opinion as appraisers conducting an appraisal under the guidelines of the American Society of Appraisers." *Id.* At the evidentiary hearing, however, both Olshin and Mitnick referred to the Inventory Opinion as an appraisal. Evidentiary Hearing at 33:14–16 (Mitnick) (identifying the Auction Advisors' report as an "appraisal"), 83:6–9 (Olshin) (explaining that furniture and other fixtures were identified "in our appraisal").

[67] Inventory Opinion at 1. Auction Advisors reached this calculation by assigning a liquidation value of 10% to the cost of the inventory. *Id.*

[68] The Inventory Opinion does not mention the inventory sale to Sports Direct.

[69] *Id.* at 1–2.

Advisors identified the following bank accounts and balances: "(i) Bank of America, $86,862; (ii) Rockland Trust, $86,119; and (iii) HSBC, $4,171," totaling $177,152.[70] Auction Advisors opined that the total liquidation value of all of the Assignor's assets was $209,656.[71] The Inventory Opinion was not accompanied by an affidavit.

In addition to filing the Inventory Opinion, the Assignee notified the court on October 3, 2019, that it had unilaterally posted a bond of $209,656, representing the total liquidation value of the assets stated in the Inventory Opinion.[72]

---

[70] *Id.* at 2. The HSBC bank account referenced in the Inventory Opinion appears to be different from the account that held the Sublease Payments, of which neither the Assignee nor its counsel was purportedly aware of until several months after the Assignment. *See* Dkt. 33 ¶ 7 (indicating the Assignee did not become aware of a Sublease Payment in the HSBC account until "almost a year" after it was made in October 2019); Dkt. 40 ¶ 8 (representing that the Assignee was "not immediately aware" of the HSBC account where Fisher wired the Sublease Payments). When Mitnick was asked about the HSBC account at the evidentiary hearing, he provided conflicting testimony. *Compare* Evidentiary Hearing at 41:18–22 (Mitnick) ("Q: Was one of the bank accounts that you initially knew about an HSBC account? . . . A: Yes."), *with id.* 43:13–43:20 (Mitnick) ("Q: [W]asn't one of the accounts that you initially knew about an HSBC account . . . ? A: No, as memory serves me, and it's been six years, I don't think we knew about the HSBC account until we were advised by the Greenwich landlord, but I could be mistaken.").

[71] Inventory Opinion at 2.

[72] Dkt. 13. The Assignee obtained the bond from Hartford Fire Insurance Company. *Id.*

## 2. The Motion and Home Club's Objection

The Assignee filed the Motion on June 12, 2020, accompanied by a final accounting.[73] Neither the Motion nor the final accounting reflected the HSBC account that held the Sublease Payments.[74]

On September 21, 2021, the Assignee filed a supplemental motion and amended final accounting (the "First Revised Accounting").[75] The supplemental motion indicated that there was a mathematical error in the final accounting, which was corrected in the First Revised Accounting.[76] In addition, the Assignee explained that it had become aware of the Greenwich Lease after the Assignment, and that the Assignee was now in possession of the Sublease Payments that were previously held in an HSBC account.[77] The Assignee is of the view that the Sublease Payments are not part of the Assignment estate, and that the Greenwich Landlord is entitled to

---

[73] Dkt. 23.

[74] *See id.* Ex. A (containing no reference to either HSBC account in the final accounting).

[75] Dkts. 40–41.

[76] Supplement to Motion ¶ 4.

[77] *Id.* ¶¶ 5, 7, 9. In October 2020, the Assignee filed a motion to compel HSBC to turn over the funds in the account that held the Sublease Payments. Dkt. 33. That motion was resolved without court involvement. Dkt. 38.

those funds.[78]  The First Revised Accounting reflects the proposed payment of the Sublease Payments to the Greenwich Landlord.[79]

On November 30, 2021, Home Club filed an objection to the Motion and First Revised Accounting (the "Objection").[80]  Home Club is the landlord for one of the Assignor's three Massachusetts stores and is an unsecured creditor.[81]  Home Club's primary objection is that the Sublease Payments are assets of the Trust and should be distributed pro rata to the Assignor's creditors—not paid to the Greenwich Landlord.[82]

On December 30, 2021 and January 10, 2022, the Assignee filed motions to extend the deadline to respond to the Objection, each of which the court granted.[83] On January 14, 2022, the Assignee and the Greenwich Landlord each responded to the Objection, disputing that the Sublease Payments are assets of the Trust.[84]  The

---

[78] Supplement to Motion ¶ 9.

[79] Dkt. 41.

[80] Dkt. 48.

[81] Supplement to Motion ¶ 2.

[82] Dkt. 48 at 2–5.  Home Club separately objects to the proposed payment of $27,187.33 in "Liquidator & Appraiser Fees," as reflected on the First Revised Accounting. *Id.* at 6–7.  Home Club also argues that there are additional accounting discrepancies in the First Revised Accounting, specifically regarding the Greenwich Landlord's claim against the Assignment estate. *Id.* at 7–8.

[83] Dkts. 53–56.

[84] Dkts. 57–58.

18

court held a telephonic hearing on the Motion and the Objection on February 4, 2022, which was adjourned.[85] At the hearing, the court raised a series of issues regarding the Assignee's lack of compliance with the ABC Statute and the disposition of the Trust's assets, particularly with respect to the Sports Direct sale.[86] The court directed the parties to meet and confer and provide the court with a status report on or before March 4, 2022.[87]

In accordance with the court's order, the Assignee filed status reports on March 4, March 18, and April 15, 2022, requesting additional time to allow for settlement discussions between the Assignee and Home Club regarding the Objection.[88] On August 10, 2022, the Assignee informed the court that the Assignee and Home Club were engaged in discovery,[89] but the parties were ultimately unsuccessful in reaching a settlement.[90]

---

[85] Dkt. 65.

[86] *See* Dkt. 64.

[87] *Id.*

[88] Dkts. 66–68.

[89] Dkt. 71.

[90] Previous settlement discussions between Home Club and the Assignee were also unsuccessful. Supplement to Motion ¶ 2 (explaining that the parties had been in settlement discussions since September 2020 but were "unable to reach a resolution," prompting the Assignee to file its supplemental submission in support of the Motion in September 2021).

### 3. The Order to Show Cause

Following an extended period with no substantive activity on the docket, the court, on December 4, 2023, issued an order to show cause why the Assignee should not be removed pursuant to 10 *Del. C.* § 7386, or alternatively why the case should not be dismissed for the Assignee's failure to comply with the ABC Statute (the "Order").[91] The Assignee, Home Club, and the Greenwich Landlord each filed responses to the Order, requesting that the court allow the proceeding to continue, and that the court hold a subsequent hearing on the Motion.[92]

The court entered a scheduling order on February 16, 2024, and scheduled a hearing on the Motion and the Order for March 20, 2024.[93] The Assignee subsequently moved to amend the scheduling order, which the court granted.[94] Per the amended scheduling order, the Assignee was required to submit an updated final accounting by March 8, 2024.[95] Interested parties were required to file any exceptions to the revised final accounting, the Motion, or the Order by March 14, 2024.[96]

---

[91] Dkt. 74 [hereinafter "Order to Show Cause"].

[92] Dkts. 75–77.

[93] Dkt. 78.

[94] Dkts. 79–81.

[95] Dkt. 81 ¶ 1.

[96] *Id.* ¶ 2.

"[I]n lieu of the yearly accounts required under 10 *Del. C.* § 7385," the Assignee submitted a "ledger showing all funds into and out of the Trust since the Trust first came into possession of the [Assignor]'s assets" by the March 8 deadline.[97]  Both the Greenwich Landlord and Home Club filed timely exceptions.[98] The Greenwich Landlord reiterated its position that the Sublease Payments are not assets of the Trust.[99]  Home Club objected that the ledger did not satisfy the requirements of the ABC Statute.[100]

The Assignee responded to both exceptions on March 18, 2024.[101]  The Assignee argues that the preparation of yearly accountings at this stage in the proceeding "would have been a waste of resources" and "more complicated for parties to analyze and digest[.]"[102]  The Assignee also maintains that the Sublease Payments are not assets of the Trust, and as a result, the Assignee is not proposing

---

[97] Dkt. 83 at 1.

[98] Dkts. 84–85.

[99] Dkt. 84 ¶ 1.  The Greenwich Landlord reserved its right to take exception to Home Club's "highly inflated" claim against the Assignment estate if the court declined to approve the distribution of the Sublease Payments.  *Id.* ¶ 3.  The Greenwich Landlord did not previously take exception with the amount of Home Club's claim.

[100] *See* Dkt. 85 at 2–3.  Home Club also argued that any fees previously paid to the Assignee and the Assignee's professionals should be subject to disgorgement.  *Id.* at 3–4.  In addition, Home Club, for the first time, requested payment of its attorneys' fees and interest since the filing of the ABC petition.  *Id.* at 4.

[101] Dkt. 87.

[102] *Id.* ¶ 9.

to give preferences to any of the Assignor's creditors, contrary to Home Club's assertions.[103]

The court held a hearing on the Motion and the Order on March 20, 2024.[104] At the March 20 hearing, the Assignee presented live testimony from two witnesses: Mitnick and Olshin.[105] During the hearing, the court raised a series of concerns regarding the Assignee's compensation under the Assignment Agreement.[106] The court requested that the Assignee provide a revised final accounting and a detailed description of the Assignee's compensation within 10 days of the hearing.[107] The Assignee submitted supplemental materials regarding its compensation and a revised final accounting on March 29, 2024.[108]

## II.   ANALYSIS

ABCs are "state or common law alternatives to bankruptcy, which trace back to English common law." Robert Richards & Nancy Ross, *Practical Issues in Assignments for the Benefit of Creditors*, 17 Am. Bankr. Inst. L. Rev. 5, 6 (2009); *see also In re Aceragen, Inc.*, 2024 WL 2705703, at *2 (Del. Ch. May 24, 2024)

---

[103] *Id.* ¶ 10.

[104] Dkt. 90.

[105] Evidentiary Hearing at 12:4–7, 64:1–2.

[106] *Id.* at 117:6–118:21.

[107] *Id.* at 127:19–22, 128:7–9.

[108] Dkt. 91.

(ORDER) ("An assignment for the benefit of creditors is not a bankruptcy proceeding.").[109] In an ABC, the company, or assignor, assigns all of its assets to an assignee, which is charged with liquidating the assets and distributing the proceeds to the assignor's creditors. *See* Melanie Rovner Cohen & Joanna L. Challacombe*, Assignment for Benefit of Creditors–A Contemporary Alternative for Corporations*, 2 DePaul Bus. L.J. 269, 270 (1990). The ABC process varies by jurisdiction. Elizabeth Pollman, *Startup Failure*, 73 Duke L.J. 327, 360 (2023); Berman, *The ABCs of ABCs* 3. Certain jurisdictions require court supervision of the assignment and the assignee, while other jurisdictions permit assignments to proceed without court supervision, "but require[] that the assignee follow state laws applicable to and governing the liquidation of a business and its assets." Berman, *The ABCs of ABCs* 3. Other jurisdictions convert assignments to receiverships. *Id.* at 4.

---

[109] Unlike in bankruptcy, an ABC "do[es] not give a debtor a discharge" of its debts. Geoffrey L. Berman, *General Assignments for the Benefit of Creditors: The ABCs of ABCs* 5 (Robert J. Keach & Steven L. Victor eds., 5th ed. 2019) [hereinafter "Berman, *The ABCs of ABCs*"]. There is also no assignment equivalent of the bankruptcy automatic stay. *Id.*; *see, e.g.*, *In re Kidbox.com, Inc.*, C.A. No. 2022-0379-PAF (Del. Ch. May 16, 2022) (ORDER) (denying *ex parte* application for the functional equivalent of a bankruptcy automatic stay which is not provided for in the ABC Statute). In a chapter 11 bankruptcy, a debtor is permitted to seek court approval to sell assets free and clear of all claims and encumbrances, an option that may not be available in an ABC. 11 U.S.C. § 363(f); *cf. Aceragen*, 2024 WL 2705703, at *2 (observing that the ABC Statute does not contain a provision providing for court approval of free and clear asset sales like the federal bankruptcy code).

In Delaware, ABCs are governed by statute and involve judicial oversight. *In re Vernon Hills Serv. Co.*, 2024 WL 889963, at *4 (Del. Ch. Feb. 29, 2024). Most ABC matters in this court proceed *ex parte*. *See Matter of Glob. Safety Labs, Inc.*, 275 A.3d 1278, 1280 (Del. Ch. 2022). "Historically, *ex parte* ABC matters often provided little transparency to creditors, limited and incomplete information about the initiation of the ABC, and, frequently, failed to comply with the statutory requirements." *In re WindMIL Therapeutics, Inc.*, 2024 WL 1092326, at *2 (Del. Ch. Mar. 13, 2024); *see, e.g.*, *Glob. Safety Labs*, 275 A.3d at 1279–80 (observing that "bare-bones four-page documents consisting principally of conclusory averments" are "representative of petitions that the court sees regularly" in ABC cases). In recent years, the court has focused on increasing the transparency of the ABC process by "requiring more detailed information from assignees and establishing firm deadlines to the extent they are not otherwise contained in the ABC [S]tatute." *Id.* (citing recent scheduling orders in ABC cases). These orders from the court "supplement, not supplant, the statutory requirements for ABCs." *Id.*

Regrettably, this 2019 case epitomizes the lawlessness of a period in which Delaware ABC proceedings were known as "the Wild West of bankruptcy." *Id.* (quoting Leslie A. Pappas, *Del. Chancery Cracks Down on Non-Bankruptcy Bankruptcies*, Law360 (May 19, 2022)). The statutory violations in this case are numerous and striking, particularly given the relatively few mandates of the ABC

Statute. The court begins with a discussion of the statutory framework, followed by a recounting of the Assignee's repeated failures to comply with the ABC Statute, which justify the court's imposition of the extreme sanction of removing the Assignee.

## A.    The Statutory Framework

The ABC Statute contains seven sections. The execution of the assignment triggers the application of the ABC Statute. Section 7381, the first section of the ABC Statute, provides:

> *In every case in which any person makes a voluntary assignment* of his or her estate, real or personal, or of any part thereof to any other person in trust for his or her creditors or some of them, *the assignee, within 30 days after the execution thereof, shall file* in the office of the Register in Chancery of the county in which the real and personal estate of the assignor is situate, *an inventory or schedule of the estate or effects so assigned, accompanied with an affidavit by such assignee*, that the same is a *full and complete inventory of all such estate and effects,* so far as the same has come to his or her knowledge.

10 *Del. C.* § 7381 (emphasis added). The use of the term "shall" with respect to the filing of the inventory and the affidavit reflects that this requirement is mandatory. *See Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1219 (Del. 2021) ("[W]hen construing [a] statute, 'shall' generally signals [a] mandatory requirement while 'may' is permissive." (alterations in original) (internal quotation marks omitted)); *see also In re Weaver Hldg. Co.*, 2011 WL 5910707, at *1 (Del. Ch. Nov. 28, 2011) (concluding that use of the word "shall" in Section 7383 of the ABC statute

indicated that the court could not waive the requirement that the assignee give a bond).

The starting point for an ABC proceeding in this court is the filing of a petition. The petition typically contains general background information about the assignor and the assignee, the assignor's business prior to the assignment, and the events leading up to the assignment.[110] In addition, the petition typically includes the assignment agreement[111] and the corporate resolutions authorizing the assignment as exhibits.[112]

Within 30 days of the assignment, the assignee must file the affidavit of inventory with the court. *See WindMIL*, 2024 WL 1092326, at *3 (explaining that the affidavit of inventory, though filed contemporaneously with the petition, was untimely because it was filed over nine months after the assignment occurred). In

[110] *See, e.g.*, *In re Blue Lantern Health, LLC*, Consol. C.A. No. 2024-0427-PAF (Del. Ch.), Dkt. 1 [hereinafter "*Blue Lantern* Petition"]; *In re Cureatr, Inc.*, C.A. No. 2023-1274-PAF (Del. Ch.), Dkt. 1 [hereinafter "*Cureatr* Petition"]; *In re Aceragen, Inc.*, C.A. No. 2023-0838-PAF (Del. Ch.), Dkt. 1 [hereinafter "*Aceragen* Petition"]; *In re DFO Parent Hldg. LLC*, C.A. No. 2021-0877-KSJM (Del. Ch.), Dkt. 1 [hereinafter "*DFO* Petition"]; *In re Complexa, Inc.*, C.A. No. 2020-0700-KSJM (Del. Ch.), Dkt. 1 [hereinafter "*Complexa* Petition"]; *In re EndoStim, Inc.*, C.A. No. 2019-0924-MTZ (Del. Ch.), Dkt. 1 [hereinafter "*EndoStim* Petition"].

[111] *See, e.g.*, *Blue Lantern* Petition Exs. C-1–C-3; *Cureatr* Petition Exs. B–C; *Aceragen* Petition Ex. A; *DFO* Petition Ex. A; *Complexa* Petition Exs. A–B; *EndoStim* Petition Ex. A.

[112] *See, e.g.*, *Blue Lantern* Petition Ex. G; *Cureatr* Petition Ex. F; *In re Stackpath Mgmt., Inc.*, C.A. No. 2024-0647-PAF (Del. Ch.), Dkt. 1 Ex. 3.

practice, the inventory list is attached as an exhibit to the affidavit. The inventory list is typically in a balance-sheet format, which identifies the property by general category (*i.e.*, cash, cash equivalents, accounts receivable, real property, fixtures and equipment, and intellectual property) and provides the book value of the property at or near the date of the assignment, if available.[113] The assignee typically conducts a UCC search and confirms in the affidavit whether there are any liens on the property of the assignment estate.[114]

The filing of the affidavit of inventory triggers the next section of the ABC Statute, which pertains to appraising the assets of the assignment estate. Section 7382 states:

> Upon the filing of the inventory and affidavit required by § 7381 of this title, *the Court of Chancery shall appoint 2 disinterested and competent persons to appraise the estate assigned*, who shall, after being duly sworn or affirmed by some person having authority to administer oaths, to perform their duties with fidelity, forthwith proceed to make an appraisement of the estates and effects assigned, according to the best of their judgment, and having completed the same, *shall return the inventory and appraisement to the office of the Register in Chancery of the county in which the inventory of the assignee and the affidavit accompanying the same were filed*. The appraisers shall receive the

---

[113] *See, e.g.*, *In re Cureatr, Inc.*, C.A. No. 2023-1274-PAF (Del. Ch.), Dkt. 8 [hereinafter "*Cureatr* Inventory Aff."]; *In re EndoStim, Inc.*, C.A. No. 2019-0924-MTZ (Del. Ch.), Dkts. 4–5 [hereinafter "*EndoStim* Inventory Aff."]; *In re Gearbox, LLC*, C.A. No. 2021-0005-KSJM (Del. Ch.), Dkt. 2 [hereinafter "*Gearbox* Inventory Aff."]; *In re Coskata, Inc.*, C.A. No. 11644-VCS (Del. Ch.), Dkt. 2 [hereinafter "*Coskata* Inventory Aff."].

[114] *See, e.g.*, *Cureatr* Inventory Aff. ¶ 22; *EndoStim* Inventory Aff. ¶ 5; *Gearbox* Inventory Aff. ¶ 12; *Coskata* Inventory Aff. ¶ 6.

same compensation as is now allowed by law to appraisers of the estate of a decedent.

10 *Del. C.* § 7382 (emphasis added). In practice, the assignee files a motion with the court seeking appointment of appraisers, which recommends at least two appraisers for the court's consideration and includes information about the qualifications of the proposed appraisers.[115] The motion typically is accompanied by affidavits of disinterestedness from each appraiser, so as to satisfy the oath requirement of Section 7382.[116] Once appointed by the court, the two appraisers are required to appraise the assignor's assets as of the date of the assignment and file those appraisals with the court.[117]

The appraisals are the necessary antecedent to the bond requirement of Section 7383, which provides that the assignee "shall . . . give bond with sufficient

---

[115] *See, e.g.*, *In re Kidbox.com, Inc.*, C.A. No. 2022-0379-PAF (Del. Ch.), Dkt. 6 ¶¶ 11–13 [hereinafter "*Kidbox* Motion to Appoint Appraisers"]; *In re gen-E, LLC*, Consol. C.A. No. 2020-0635-PAF (Del. Ch.), Dkt. 8 ¶¶ 11–13 [hereinafter "*gen-E* Motion to Appoint Appraisers"]; *In re Velicept Therapeutics, Inc.*, C.A. No. 2020-1068-KSJM (Del. Ch.), Dkt. 3 ¶¶ 5–7 [hereinafter "*Velicept* Motion to Appoint Appraisers"]; *In re Fathom Water Mgmt. Hldgs., LLP*, C.A. No. 2020-0058-JTL (Del. Ch.), Dkt. 4 ¶¶ 3–5 [hereinafter "*Fathom* Motion to Appoint Appraisers"].

[116] *See, e.g.*, *Kidbox* Motion to Appoint Appraisers Exs. C–D; *gen-E* Motion to Appoint Appraisers Exs. B–C; *Velicept* Motion to Appoint Appraisers Exs. B–C; *Fathom* Motion to Appoint Appraisers Exs. B–C.

[117] *See, e.g.*, *In re Mobex Fourth and 1, LLC*, C.A. No. 2024-0163-PAF (Del. Ch.), Dkts. 11–12; *In re Cureatr, Inc.*, C.A. No. 2023-1274-PAF (Del. Ch.), Dkt. 15; *In re DFO Parent Hldg. LLC*, C.A. No. 2021-0877-KSJM (Del. Ch.), Dkts. 13–14; *In re Xtuit Pharms., Inc.*, C.A. No. 2018-0179-TMR (Del. Ch.), Dkt. 5.

surety, *to be approved by the Court of Chancery in an amount fixed by the Court*, being not less than the total amount of inventory and appraisement of the estate so assigned." 10 *Del. C.* § 7383(a) (emphasis added). "[T]he inventory, appraisals, and bond are all focused on the same snapshot in time: the moment of assignment." *In re Summit Nats., Inc.*, 2024 WL 2833515, at \*2 (Del. Ch. June 3, 2024) (ORDER).

Standard practice in this court is for the assignee to file a motion seeking an order from the court to set the bond in an amount tied to the appraisals.[118] Sometimes, an assignee will request that the amount of the bond be the average of the two appraisals; sometimes, it will be at the higher of the two appraisals.[119] After reviewing the appraisals, the court sets the amount of the bond;[120] the assignee then obtains the bond and provides notice to the court.[121] Upon the application of any

---

[118] *See, e.g.*, *In re LM Indus. Gp., Inc.*, C.A. No. 2022-0148-PAF (Del. Ch.), Dkt. 5; *In re Sequel Youth and Fam. Servs., LLC*, C.A. No. 2022-0198-PAF (Del. Ch.), Dkt. 10; *In re Illumitex, Inc.*, C.A. No. 2020-1102-KSJM (Del. Ch.), Dkt. 9.

[119] Where the appraisals contain computational errors or flawed analysis, the court has set the bond higher than the amount of the appraisals. *See, e.g.*, *In re Custom Furniture Techs., Inc.*, 2022 WL 1553551, at \*2 (Del. Ch. May 17, 2022); *In re LM Indus. Gp., Inc.*, C.A. No. 2022-0148-PAF (Del. Ch. May 17, 2022) (ORDER).

[120] *See, e.g.*, *In re Aceragen, Inc.*, C.A. No. 2023-0838-PAF (Del. Ch. June 6, 2024) (ORDER); *In re Sequel Youth and Fam. Servs., LLC*, C.A. No. 2022-0198-PAF (Del. Ch. Sept. 13, 2022) (ORDER); *In re Illumitex, Inc.*, C.A. No. 2020-1102-KSJM (Del. Ch. May 12, 2021) (ORDER).

[121] *See, e.g.*, *In re DDP DMO Hldgs., LLC*, C.A. No. 2023-0989-PAF (Del. Ch.), Dkt. 23; *In re Revelar Biotherapeutics, Inc.*, C.A. No. 2022-0921-PAF (Del. Ch.), Dkt. 10; *In re Teatime Games, Inc.*, C.A. No. 2021-0307-KSJM (Del. Ch.), Dkt. 10. In 2021, Court of

---

interested party, the court may "direct the bond provided under § 7383 of this title to be proceeded on if it deems it necessary and proper for the protection of such interested party." 10 *Del. C.* § 7384.

Section 7385 requires the assignee to "render an account of the assignee's trusteeship every year from the date of the assignee's bond" until the case is closed. *Id.* § 7385(a).[122] When filing the annual accountings, the assignee must provide notice to "all persons in interest" and give such persons an opportunity to file exceptions to the accountings with the court. 10 *Del. C.* § 7385(b). In practice, once a final accounting has been rendered, the assignee files a motion with the court to approve the final distributions, release the bond, and close the case.[123]

---

Chancery Rule 89 was amended to repeal the requirement that bonds filed in the Court of Chancery take a specific form. The amended rule provides: "Each bond filed in the Court of Chancery after December 1, 1969, shall be in the form and manner prescribed by the Court and submitted to the Register in Chancery or filed electronically." Ct. Ch. R. 89. The court has determined that "a bond in a commercially reasonable form is appropriate in light of this amendment." *In re Velicept Therapeutics, Inc.*, 2021 WL 11715230, at *2 n.11 (Del. Ch. Apr. 7, 2021) (ORDER).

[122] *See, e.g.*, *In re LM Indus. Gp., Inc.*, C.A. No. 2022-0148-PAF (Del. Ch.), Dkts. 13–14; *In re gen-E, LLC*, Consol. C.A. No. 2020-0635-PAF (Del. Ch.), Dkt. 22; *In re EndoStim, Inc.*, C.A. No. 2019-0924-MTZ (Del. Ch.), Dkts. 14, 21, 28.

[123] *See, e.g.*, *In re Kidbox.com, Inc.*, C.A. No. 2022-0379-PAF (Del. Ch.), Dkt. 13; *In re gen-E, LLC*, Consol. C.A. No. 2020-0635-PAF (Del. Ch.), Dkt. 24; *In re EndoStim, Inc.*, C.A. No. 2019-0924-MTZ (Del. Ch.), Dkt. 42. Once the assignee files a motion to approve the final accounting, the court will typically schedule a hearing on that motion. *See, e.g.*, *In re Kidbox.com, Inc.*, C.A. No. 2022-0379-PAF (Del. Ch. Feb. 27, 2024) (ORDER); *In re Complexa, Inc.*, C.A. No. 2020-0700-KJSM (Del. Ch. Apr. 26, 2024) (ORDER); *In re*

Section 7386 provides that the court, "upon cause being shown, may remove the assignee or trustee . . . and compel an assignment of the trust estate to others appointed in their stead." 10 *Del. C* § 7386. The final section of the ABC Statute, Section 7387, permits the court under certain circumstances to void preferences and assignments. *Id.* § 7387.

Delaware courts emphasized more than a century ago the importance of the statutory mandates in the ABC Statute. *See Elliott v. Montell*, 30 A. 854, 855 (Del. 1885) ("[W]hen a voluntary assignment is made, certain things must be done as . . . specified [in the ABC Statute]."). The ABC Statute "is not complicated. It has few mandates, but they must be followed." *WindMIL*, 2024 WL 1092326, at \*3. Indeed, the court has dismissed cases for an assignee's failure to comply with the ABC Statute. *See, e.g.*, *In re Aeolus Pharms., Inc.*, C.A. No. 2018-0212-PAF, at 3:20–22, 5:10–6:7 (Del. Ch. Oct. 20, 2023) (TRANSCRIPT) (dismissing ABC proceeding due to assignee's violations of Sections 7381, 7382, and 7383 of the

*Revelar Biotherapeutics, Inc.*, C.A. No. 2022-0921-PAF (Del. Ch. Dec. 28, 2023) (ORDER); *In re gen-E, LLC*, Consol. C.A. No. 2020-0635-PAF (Del. Ch. Dec. 27, 2023) (ORDER). If the court is satisfied with the assignee's disclosures and the proposed distributions, the court will approve the final accounting, release the bond, and close the case. *See, e.g.*, *In re Kidbox, Inc.*, C.A. No. 2022-0379-PAF (Del. Ch. June 7, 2024) (ORDER); *In re Complexa, Inc.*, C.A. No. 2020-0700-KJSM (Del. Ch. June 7, 2024) (ORDER); *but see In re gen-E, LLC*, Consol. C.A. No. 2020-0635-PAF (Del. Ch. Feb. 12, 2024) (ORDER) (requesting additional information from the assignee regarding the final accounting); *In re Revelar Biotherapeutics, Inc.*, C.A. No. 2022-0921-PAF (Del. Ch. Feb. 12, 2024) (ORDER) (same).

ABC Statute); *WindMIL*, 2024 WL 1092326, at *3 (same); *see also Vernon Hills*, 2024 WL 889963, at *7 (dismissing ABC proceeding involving a non-Delaware assignor for lack of subject matter jurisdiction under the ABC Statute).

Because ABC actions in this court are predominantly *ex parte*, the court must be particularly careful to enforce the statutory mandates. The ABC Statute "must be read in the light of the purpose for which it was enacted, to wit, the security afforded both to the cestui que trust and the assignor by the bond of the trustees, the inventory and appraisement, and the supervisory control of the chancellor." *Elliott*, 30 A. at 855–56. Vice Chancellor Glasscock's opinion in *Weaver* underscores this approach. 2011 WL 591070. In that case, the court agreed to waive the appraisal requirement under Section 7382(a) of the ABC Statute because "the only assets of value in the estate assigned [were] cash or cash receivables" and the only known creditor "agree[d] with the face valuation of those assets." *Id.* at *1. The court reasoned that appointing appraisers in that circumstance would "serve no useful purpose and would simply reduce the amount available to the creditor[.]" *Id*.; *accord In re Prenexus Health, Inc.*, 2023 WL 2159180, at *2 (Del. Ch. Feb. 22, 2023) (observing that the court has occasionally waived the appraisal requirement but only "upon a showing of *good cause* where the assigned assets consist of cash, accounts receivable, and assets of nominal value" (emphasis added)).

32

On the other hand, the court in *Weaver* held that the use of the word "shall" in Section 7383 indicated that the bond requirement could not be waived. 2011 WL 5910707, at *1 ("The direction of the Legislature could not be clearer that the bond requirement here, despite the proffered waiver of the creditor, be set at not less than the total amount of the inventory and appraisement."); *see, e.g.*, *In re Summit Nats., Inc.*, C.A. No. 2024-0199-PAF, at 7 (Del. Ch. Mar. 6, 2024) (ORDER) ("The court will not entertain any motion to waive the bond requirement.").[124] In short, the cases reflect the court's expectation that parties to ABC proceedings follow the statutory requirements. *See WindMIL*, 2024 WL 1092326, at *3.

**B.  The Assignee Ignored and Repeatedly Violated the ABC Statute**

In this proceeding, the Assignee failed to comply with the ABC Statute and has not justified its pervasive non-compliance, even after the court identified the shortcomings in the initial hearing on the Motion in February 2022 and in the Order.[125] In fact, Mitnick, who was both the Assignee's representative and its

---

[124] The court in *In re McBride America, Inc.*, 2010 WL 3025572 (Del. Ch. July 29, 2010), chose not to require a bond where the value of the assignment estate's assets had "been established to be zero dollars," but in doing was admittedly "skeptical that the Court has the power to waive the statutory requirement that a bond be posted." *Id*. at *1.

[125] *See* Dkt. 64 ("[T]he court raised a series of issues concerning the Assignee's compliance with the statutory scheme governing assignments for the benefit of creditors articulated in [the ABC Statute] and the process of the disposition of the Trust assets."); Order to Show Cause ¶¶ C–H. Some violations of the ABC Statute are potentially curable. *See, e.g.*,

attorney, testified that he was not aware of most of the statutory requirements when this case was initiated, despite having been "involved in a handful of Delaware ABCs" beforehand.[126] Although the Assignee initially acknowledged that this ABC proceeding under Delaware law was subject to the ABC Statute,[127] the Assignee chose not to inquire into it.[128] That willful blindness resulted in an inexcusable series of failures to comply with the mandates of the ABC Statute.

First, the Assignee did not file an affidavit of inventory within 30 days of the Assignment in accordance with Section 7381. The Assignment occurred on August

---

*Summit Nats.*, 2024 WL 2833515, at *2–3 (identifying statutory deficiencies with appraisals and denying assignee's motion to set the bond); *In re Summit Nats., Inc.*, C.A. No. 2024-0199-PAF (Del. Ch.), Dkt. 15 (submitting new appraisals and a second motion to set the bond in response to the court's order); *In re Summit Nats., Inc.*, 2024 WL 3555871 (Del. Ch. July 8, 2024) (ORDER) (granting assignee's motion to set the bond after submission of new appraisals).

[126] Evidentiary Hearing at 30:10–18, 30:21–31:5, 33:22–24 (Mitnick).

[127] *See* ABC Petition at 3 ("[T]he Assignee requests that this Honorable Court take jurisdiction over this matter pursuant to 10 *Del. C.* § 7381 . . . ."); Assignment Agreement at 1 ("[I]t is contemplated that the Assignee's disposition of the assets of the Assignor and the proceeds therefrom will occur in the context of an assignment for the benefit of creditors . . . under Delaware law[.]"); *id*. § 1.4 ("Promptly after the Effective Date, the Assignee shall commence a proceeding by petition in the Delaware Court of Chancery . . . to administer this Trust under Title 10, Chapter 73 of the Delaware Code . . . ."); *id*. § 6 ("This Trust is intended to be administered in accordance with the provisions of Delaware law governing assignments for the benefit of creditors, under subchapter VI of title 10, Chapter 73 of the Delaware Code . . . .").

[128] *See* Evidentiary Hearing at 30:10–17 (Mitnick) ("Q: Are you aware that the statutes governing ABCs in Delaware impose certain requirements on the assignee? A: I am now, and I also want to add my apology for not knowing about them on the first day. . . . I should have known about all the requirements and followed them[.]"); *id.* at 57:14–19 (Mitnick) (testifying that he did not review the ABC Statute in connection with this proceeding).

15, 2019, meaning that Assignee was required to file the affidavit of inventory on or before September 14, 2019. The ABC petition, filed the day after the Assignment, did not include an affidavit of inventory. Nor did the Assignee *ever* file one thereafter. Rather, on October 3, 2019, the Assignee filed the Inventory Opinion. The Inventory Opinion did not satisfy the statutory mandate. It was not filed "within 30 days after the execution" of the Assignment and did not include "an affidavit by [the] assignee." 10 *Del. C.* § 7381.

The Assignee acknowledges its omission of the affidavit of inventory,[129] but proffers no justifiable explanation for its non-compliance, aside from indicating that the preparation of an inventory report was costly given the location of the assets.[130] The Assignee asserts that these costs made up a "significant portion of the total value of the inventory,"[131] but fails to explain why it would be more costly to file an

---

[129] *See, e.g.*, Dkt. 75 ¶ 6 ("Regarding the Assignee's omission of an affidavit of inventory accompanying the petition and a motion to appoint appraisers, the Assignee realizes that those steps were not taken but does not believe that they would have materially changed this case."); Evidentiary Hearing at 5:7–15 (Assignee's Counsel) ("The assignee overlooked certain duties at the beginning of this case. [The ABC Statute] says that the assignee should have filed an inventory and affidavit at the beginning, should have filed two appraisals instead of one, and should have sought court approval of those appraisers before filing the appraisals, and should have been filing yearly reports. I'm not going to try to persuade the Court that those obligations weren't overlooked."); 6:20–21 (Assignee's Counsel) (acknowledging that the Assignee "did not comply with the early case requirements").

[130] Dkt. 75 ¶ 6.

[131] *Id.*

affidavit of inventory in the present action as compared to other ABC proceedings, or why the costs of preparing the affidavit of inventory excuse compliance with the statutory requirement. This post hoc rationalization does not excuse the Assignee's failures. If the Assignee truly believed that dispensing with the requirement to file an affidavit of inventory was warranted, the appropriate course of action would have been to seek leave from the court to excuse the requirement and to justify the basis for the request. The Assignee's strategy of choosing to seek forgiveness, rather than permission, has not served it well.

Second, the Assignee violated Section 7382 by failing to seek the court's appointment of two appraisers to appraise the assets of the Assignment estate. To be sure, the Inventory Opinion was not an appraisal. It contains an express disclaimer that Auction Advisors was "not rending [sic] this opinion as appraisers conducting an appraisal under the guidelines of the American Society of Appraisers."[132] *See In re Collaborative Cmty. Servs., Inc.*, 2023 WL 8809863, at *2 (Del. Ch. Dec. 19, 2023) (ORDER) (explaining that a purported appraisal which stated that it "'should not be construed as a full appraisal' and is only 'an expert's opinion as to a possible value that a full appraisal report might fall within'" "does not satisfy the requirements of Section 7382" (emphasis omitted)). The Assignee

---

[132] Inventory Opinion at 1.

36

also failed to file a motion with the court to set the amount of the bond pursuant to Section 7383(a). Instead, on October 3, 2019, the Assignee simply notified the court that it had unilaterally posted a bond in the amount of $209,656, tethered entirely to the non-conforming Inventory Opinion.[133] Again, the Assignee offers no justifiable explanation for its non-compliance with these requirements.[134] To the contrary, Mitnick testified that he was in fact aware of the appraisal requirement and did not attempt to comply[135]—another admission of, at best, the Assignee's willful blindness to the statutory mandates.

---

[133] Dkt. 13 ("[T]he bond amount of $209,656.00 is equal to the amount of the liquidation value as outlined in the Appraisal Report dated September 12, 2019."); Evidentiary Hearing at 33:14–21 (Mitnick).

[134] The Assignee argues that the court has "some flexibility" in applying the mandates of the ABC Statute, citing to the court's decisions in *Prenexus Health* and *Weaver*. Dkt. 87 ¶ 2; *see also* Evidentiary Hearing at 6:14–18 (Assignee's Counsel) ("[T]here are a couple of cases suggesting that the Court has some flexibility in treating the deadlines in the [ABC Statute] . . . under special circumstances."). This argument is flawed for many reasons. First, the court has only waived the appraisal requirement upon a showing of good cause where the assignment estate consisted of cash and receivables. *Prenexus Health*, 2023 WL 2159180, at *2 (denying motion to waive the appraisal requirement for failure to show good cause). Second, the Assignee did not, at any point, request a waiver of the appraisal requirement. Third, even if the Assignee is now requesting a waiver of the appraisal requirement, the Assignee has not made a sufficient showing of good cause to warrant a deviation from the mandates of the ABC Statute. Based on the record, the assignment estate does not consist solely of cash and receivables. *See In re Ohana Biosciences, Inc.*, 2021 WL 5329950 (Del. Ch. Nov. 15, 2021) (ORDER) (denying a motion to waive the appraisal requirement where the inventory consisted of more than just cash and receivables).

[135] Evidentiary Hearing at 32:6–11 (Mitnick) ("Q: Are you aware that there must be two appraisers? A: That, actually, I am aware of, and I knew that, and I'm sorry it wasn't filed. I had a previous case in Delaware where we did file two appraisals.").

Next, the Assignee did not file annual accountings as required by Section 7385. If, as the Assignee appears to have assumed, the bond was properly set on October 3, 2019, the Assignee was required to file an annual accounting on October 3, 2020, and each year thereafter until the close of the case. The Assignee did not satisfy this obligation. Aside from the incomplete and inaccurate final accounting submitted with the Motion in June 2020, and the First Revised Accounting submitted in September 2021, the Assignee did not file annual accountings with the court. The Assignee does not proffer any justification for its failure to submit annual accounting reports.

On March 8, 2024, the Assignee, "in lieu of the yearly accounts required under 10 *Del. C.* § 7385," submitted a "ledger showing all funds into and out of the Trust[.]" [136] The ledger does not satisfy Section 7385, nor does it remedy the Assignee's past statutory violations. The Assignee argues that "there were so few transactions during the life of the case," and "it would have been a waste of resources—not to mention more complicated for parties to analyze and digest—if the Ledger had been broken into separate yearly reports and submitted

---

[136] Dkt. 83 at 1.

simultaneously."[137]  This explanation, like the others, does not justify the Assignee's non-compliance with Section 7385.  To the contrary, it shows that the Assignee had access to the information necessary to prepare the accountings but did not do so.

### C.  There is More Than Sufficient Cause to Remove the Assignee

Given SM Financial's multiple unexplained and unjustified failures to follow the requirements of the ABC Statute, the court finds that cause exists to remove SM Financial as the Assignee pursuant to 10 *Del. C.* § 7386.

Section 7386 of the ABC Statute provides that the court may remove and replace an assignee "upon cause being shown."  10 *Del. C.* § 7386.  Section 7386 does not define "cause."  The court was unable to identify a case where an assignee has been removed for cause under Section 7386.  In other jurisdictions, courts have removed an assignee or a trustee in an ABC proceeding where the assignee engaged in self-dealing or bad faith conduct, where the assignee failed to properly manage the estate, where the assignee had a conflict of interest with an interested party, or where the assignee failed to comply with the statutory requirements for ABC proceedings.  *See Farmers & Merchs. Nat'l Bank of L.A. v. Peterson*, 55 P.2d 867,

---

[137] Dkt. 87 ¶ 9; Evidentiary Hearing at 34:6–15 (Mitnick) ("Q:  On March 8, the assignee filed a ledger instead of multiple reports.  Why did it do that?  A:  We -- we had discussed it, and it seemed like it made more sense.  It would be more easy to follow.  It brought the numbers current to, you know, a couple weeks ago, and rather than having five reports where the last one would have the number that was in the compilation, we decided to file it in a compilation.").

869 (Cal. 1936) (affirming judgment and removal of assignees where assignees engaged in self-dealing, concealment, and bad faith conduct and "were unfit to continue as trustees"); *Havens v. Sibbald*, 41 A. 371, 371–72, 374 (N.J. Ch. 1898) (removing assignee where assignee caused assets of the assignment estate "to be appraised at a very low rate" and did not obtain title to certain real property of the assignment estate); *In re Sheldon*, 76 N.Y.S. 278, 283 (N.Y. App. Div. 1902) (affirming removal of assignee where sale of assets was made in bad faith), *aff'd*, 65 N.E. 1096 (N.Y. 1902); *In re Durfee*, 4 R.I. 401, 412–13 (1856) (removing assignee where assignee procured the assignment by fraud); *King v. McClurg*, 63 N.W. 219, 219–20, 222 (S.D. 1895) (affirming removal of assignee where lower court found "gross irregularities in the management of the estate" and "there was good and sufficient cause for his removal"); *In re Assignment of the Com. Bank*, 6 Ohio Dec. 105, 105 (Ohio Insolv. 1895) (removing trustee where trustee was unable "to consider and act upon every question that shall arise in the course of the administration of the trust [] without any bias or personal embarrassment"); *Hall v. Saunders*, 15 S.W.2d 717, 718–19 (Tex. Civ. App. 1929) (explaining that appointment of replacement assignee by lower court was proper where the original assignee failed to file a bond "within five days after the delivery of the assignment" as required by statute and affirming lower court's decision on other grounds); *but see Case v. Mason*, 23 A. 48, 48 (R.I. 1885) (opining that the removal of an assignee

40

for violating the assignment statute is not mandatory, but instead in the discretion of the court "if [the] default was unintentional, or there was good excuse for it" and declining to remove assignees for "neglect[ing] to render an inventory and schedule" on the condition that assignees cure their violation within 10 days).

Since the Assignee is serving as trustee of the Assignment estate, the court also looks to trust law for guidance on when the removal of a trustee may be appropriate. In the trust context, this court has "the discretion to remove a trustee who fails to perform his duties through more than mere negligence." *McNeil v. McNeil*, 798 A.2d 503, 513 (Del. 2002); *accord Sweeney v. Sweeney*, 2024 WL 3040424, at \*13 (Del. Ch. June 24, 2024). The court may remove a trustee where there is a "breach of trust" or "the continued service of the [trustee] substantially impairs the administration of the trust." 12 *Del. C.* §§ 3327(1)–(2); *see also Sweeney*, 2024 WL 3040424, at \*13; *In re Heizer Corp.*, 1988 WL 58272, at \*21 (Del. Ch. June 18, 1998) (explaining that trustee removal is an appropriate remedy where the trustee "fails to obey a court order concerning the administration of the trust," the trustee's duties are in conflict with his personal interests, the trustee commingles trust and personal property, or the trustee commits "other similar serious breaches of trust"). "Generally speaking, removal of a trustee is an extreme form of equitable relief that should be exercised sparingly." *Tigani v. Tigani*, 2021 WL 1197576, at \*21 (Del. Ch. Mar. 30, 2021) (internal quotation marks omitted),

41

*aff'd*, 271 A.3d 741 (Del. 2022). Trustee removal is warranted where "trust property is 'endangered by a lack of capacity, honesty or fidelity,' and is not appropriate for 'some mere negligent breach of duty, arising largely from an honest mistake.'" *Sweeney*, 2024 WL 3040424, at *13 (quoting *In re Catell's Est.*, 38 A.2d 466, 469–70 (Del. Ch. 1944)).[138]

In applying these principles, the court concludes that SM Financial's pervasive non-compliance with the ABC Statute is sufficient cause to warrant its removal as Assignee. SM Financial was tasked as Assignee with administering the assets of the Assignment estate for the benefit of the Assignor's creditors. A fundamental part of that process, at least in Delaware, where ABC proceedings are governed by statute, is ensuring that the ABC is statutorily compliant. SM Financial fell entirely short of the mark in this proceeding. SM Financial is not a newcomer

---

[138] In federal bankruptcy proceedings, bankruptcy courts may remove a trustee, other than the United States trustee, for cause after notice and a hearing. 11 U.S.C. § 324(a). "Cause" for removal of a trustee is not defined by the bankruptcy code and must be determined "on a case-by-case basis." *In re Syntax-Brillian Corp.*, 554 B.R. 723, 726 (Bankr. D. Del. 2016). "Cause to remove a trustee includes 'trustee incompetence, violation of the trustee's fiduciary duties, misconduct or failure to perform the trustee's duties, or lack of disinterestedness or holding an interest adverse to the estate.'" *In re United Tax Gp., LLC*, 622 B.R. 148, 156 (Bankr. D. Del. 2020) (quoting *In re AFI Hldg., Inc.*, 530 F.3d 832, 845 (9th Cir. 2008)). "A trustee removed for 'cause' in one case will be removed from all other cases in which the trustee is then serving, 'unless the court orders otherwise.'" *Id.* at 157 (quoting 11 U.S.C. § 324(b)). As such, "the removal of a trustee is an extreme remedy," but "the decision to remove a trustee is within the sound discretion of the bankruptcy court." *Id.*

to the ABC process generally or in Delaware specifically. It chose not to review the ABC Statute and violated it repeatedly in this proceeding. Even after the court pointed out the statutory violations, SM Financial made no attempt to try and correct its missteps. The Assignee's failure to adhere to the ABC Statute is not mere negligence or an "honest mistake," but instead the product of its willful blindness to the statutory requirements. *Catell's Est.*, 38 A.2d at 470; *see, e.g.*, *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 62 (Del. 2006) ("[T]he concept of *intentional dereliction of duty, a conscious disregard for one's responsibilities*, is an appropriate (although not the only) standard for determining whether fiduciaries have acted in good faith." (emphasis in original) (quoting *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005)); *Heron Bay Prop. Owners Ass'n, Inc. v. CooterSunrise, LLC*, 2013 WL 3871432, at *4–6, *9 (Del. Ch. June 27, 2013) (finding that homeowners' willful blindness to restrictive covenants was an insufficient justification for violation where homeowners "were given several opportunities to investigate" the restrictive covenants but did not do so and concluding that the covenants were enforceable), *adopted sub nom. Heron Bay Prop. Owners Ass'n, Inc. v. Cooter Sunrise, LLC*, 2013 WL 3734745 (Del. Ch. July 16, 2013) (ORDER); *Homan v. Turoczy*, 2005 WL 2000756, at *15 (Del. Ch. Aug. 12, 2005) (rejecting claim of equitable fraud where buyer was willfully blind to the

43

existence of financial records and did not request to review them prior to entering into transaction).[139]

Removal for cause is also warranted under Section 4.3 of the Assignment Agreement. That section defines cause, in pertinent part, as "gross negligence, gross misconduct, fraud, embezzlement, or theft," or "such other cause as the Court shall determine to evidence that the Assignee is unable or unfit to perform the duties set forth herein."[140] The court similarly concludes that SM Financial's pervasive non-

---

[139] The Assignee's pervasive non-compliance with the ABC Statute and failure to review the statutory requirements amount, at the very least, to gross negligence. "In the corporate context, gross negligence has its own special meaning that is akin to recklessness." *In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 689 (Del. Ch. 2023). By contrast, "[i]n civil cases not involving business entities, the Delaware Supreme Court has defined gross negligence as 'a higher level of negligence representing an extreme departure from the ordinary standard of care.'" *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 550–51 (Del. Ch. 2023) (quoting *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1990)). Under this framework, "gross negligence 'signifies more than ordinary inadvertence or inattention,' but it is 'nevertheless a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm.'" *Id.* at 551 (quoting *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 530 (Del. 1987)). The Assignee did not make a genuine effort to comply with any of the mandates of the ABC Statute, despite having previously participated in Delaware ABC proceedings and acknowledging at the outset of this proceeding that the Trust would be administered in accordance with the ABC Statute. Evidentiary Hearing at 12:22–13:7 (Mitnick); Assignment Agreement §§ 1.4, 6. Instead, the Assignee repeatedly failed to adhere to the statutory requirements. *See Venhill Ltd. P'ship ex rel. Stallkamp*, 2008 WL 2270488, at *30 (Del. Ch. June 3, 2008) (concluding that former general partner of a trust acted in a grossly negligent manner where his "decisions did not involve any rational consideration of relevant factors" and there was no "genuine effort to comply with the expected duty of care").

[140] Assignment Agreement § 4.3.

compliance with the ABC Statute is sufficient cause to warrant its removal as Assignee under the Assignment Agreement.

The Assignee's repeated violations of the ABC Statute alone are enough to warrant its removal. But the Assignee's conduct in this case further supports this decision. The Assignee had no direct contact with any of the directors or officers of the Assignor at any point.[141] Nor did the Assignee request financials statements or other ledgers from the Assignor prior to executing the Assignment Agreement.[142] The Assignee's lack of knowledge of the Greenwich Lease and the Sublease Payments, which increased the costs and extended the length of this proceeding, is reasonably attributable to these failures. *See* Berman, *The ABCs of ABCs* 22 ("Part of the early administration of any estate involves taking control of the assignor's assets and books and records, and interviewing the assignor to ascertain the existence and value of all assets, including those assets that the assignee might not have considered at the time of the assignment.").

---

[141] Evidentiary Hearing at 57:20–58:4 (Mitnick) ("Q: Did you have any communication with anyone from the assignor? A: Ever? Q: Ever. A: I don't believe so. Q: So you had no direct contact with any of the officers or directors of the assignor? A: I don't think so . . . .").

[142] *Id.* at 58:17–59:2 (Mitnick) ("Q: Did you receive ledgers or financial statements of the assignor prior to the time that you executed the assignment agreement? A: I don't think so. Q: At what time did you receive the financial statements or any ledgers of the assignor, vis-à-vis when you became the assignee? A: I -- I don't recall, and I don't recall actually how much documentation that we got from this assignor.").

The Assignee also hired SM Law, its affiliated law firm, as its counsel, even though it is not apparent that retention of a second law firm was necessary or appropriate in this case, particularly given the limited assets of the Assignor.[143] The Assignee's compensation structure magnifies the court's concern over the Assignee's unilateral retention of SM Law. The Assignment Agreement provided for a 20% commission to the Assignee for all distributions made pursuant to Section 2.3, which includes "expenses and debts of the Trust . . . including but not limited to amounts owed to the Assignee, the Trust's professionals, and the Assignor's professionals[.]"[144] As a general matter, this structure does nothing to incentivize the Assignee to minimize expenses. And in the specific circumstances of this case, the compensation structure enabled SM Financial to collect its 20% commission based upon the fees billed by SM Law.[145] Thus, the retention of SM Law effectively

---

[143] SM Law has no offices in Delaware. Neither the Assignor nor its assets have any connection to New Jersey. None of the issues in this proceeding appear to involve New Jersey law, and there is nothing in the record identifying the legal services that SM Law provided to the Assignee that Mitnick, as the General Counsel and representative of the Assignee, could not have undertaken in that capacity or that Hiller Law could not have provided. According to the First Revised Accounting, the Trust paid $15,900 to SM Law through April 30, 2020, and an additional $16,392.60 after April 30, 2020, totaling $32,292.60. Dkt. 41. The First Revised Accounting also lists another $8,580 to be paid to SM Law at the conclusion of the case. *Id.*

[144] Assignment Agreement §§ 2.3, 2.7(a).

[145] The Assignee represents that the fee structure in this case is similar to the compensation paid to assignees in ABC proceedings in New Jersey, which is governed by statute. *See*

46

increased the total amount of fees payable to Mitnick's family businesses and decreased the amounts to be distributed to the Assignor's creditors.[146]

This conduct and SM Financial's unexplained and unjustified failures to adhere to the ABC Statute constitute sufficient cause to remove SM Financial as Assignee. The court does not make this decision lightly. Removal of an assignee is an extreme form of equitable relief, but the court, in its discretion, concludes that it is warranted here.

---

Evidentiary Hearing at 115:16–116:3 (Assignee's Counsel). Under the New Jersey ABC statute, an assignee's commission is subject to the court's discretion and may not exceed "20% on all sums received by the said assignee, except that this limitation shall be inapplicable where the amount of the estate is less than $500.00." N.J. Stat. § 2A:19-43. The 20% limitation is "'confined to sums awarded directly to the assignee and does not include items of expense paid out of the estate for which court approval is sought, that is, attorney fees, auctioneer fees and the like.'" *In re Vill. Sundries & Tobacco, Inc.*, 2017 WL 1418384, at *3 (N.J. Super. Ct. App. Div. Apr. 21, 2017) (quoting *In re Francilli Carriers, Inc.*, 187 A.2d 45, 47 (N.J. Super. Ct. Ch. Div. 1962)). In other words, under New Jersey law, certain expenses that are subject to court approval appear to be excluded from the calculation of an assignee's commission. That is not the case here. The plain language of the Assignment Agreement provides that the Assignee is entitled to 20% of all distributions from the Trust, which expressly includes "expenses and debts of the Trust[.]" Assignment Agreement §§ 2.3; 2.7(a). It is also notable that assignees in New Jersey ABCs must obtain court approval to retain counsel on behalf of the assignment estate, and "[c]ourt approval of the retention is a condition to any award of counsel fees for services performed on behalf of the assignee." *Sundries & Tobacco*, 2017 WL 1418384, at *3.

[146] Mitnick testified that SM Law provided "all the legal services that were required to move this case from Point A to its conclusion," but did not provide any specific information about these services or explain why SM Law's services were necessary or appropriate given the retention of Hiller Law as Delaware counsel for the Assignee. Evidentiary Hearing at 59:18–20 (Mitnick); *but see* Dkt. 41 (indicating that $53,134.28 in legal fees have been paid to Hiller Law and $15,000 of additional fees will be paid to Hiller Law at the close of the case). Neither of the Assignee's counsel has justified the amount of their fees in light of the multiple violations of the ABC Statute.

**D.      Next Steps**

The removal of the Assignee will require further proceedings before this matter can be closed.  Appointment of a new assignee is one possible path forward, but there may be others.  In the interim, pursuant to Section 5 of the Assignment Agreement, the court is extending the term of the Trust until further order of the court.  In addition, no funds shall be distributed from the Trust without court approval.  The bond shall remain in place and may be subject to further proceedings.

**III.     CONCLUSION**

For the foregoing reasons, the Motion is denied, and SM Financial is removed as Assignee pursuant to *10 Del. C*. § 7386.